Larry POPE, Plaintiff,

v.

CITY OF HICKORY, NORTH CAROLINA, Defendant.

No. ST–C–80–16.

United States District Court, W. D. North Carolina, Statesville Division.

Aug. 17, 1981.

dum opinion and order herein of October 19, 1981.

Joyce M. Brooks, Sheely & Brooks, Charlotte, N. C., for plaintiff.

E. Murray Tate, Jr., Hickory, N. C., for defendant.

WOODROW WILSON JONES, Chief Judge.

The Plaintiff, Larry Pope, brought this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e *et seq.*, and 42 U.S.C.A. § 1981 against his former employer, the City of Hickory, alleging racial discrimination in its employment practices, specifically in the areas of job assignment, and discipline. For these alleged wrongs the Plaintiff seeks declaratory, injunctive and monetary relief from the Defendant.

The Defendant timely answered the complaint and denied its material allegations.

The Court tried the case without a jury on June 16, 1981 in Statesville. At trial the Plaintiff contended that he was more severely disciplined than white employees who committed similar offenses. According to the Plaintiff he was victimized by a standardless, disciplinary structure which was composed of white supervisors. Ultimately, the Plaintiff was discharged from his employment. Secondly the Plaintiff asserted that he was improperly denied a shift transfer, from second to first, also on account of his race and inter-racial associations. Instead two white employees, both with less seniority than Plaintiff, were purportedly transferred to vacancies on the first shift. The Defendant denies any discrimination against the Plaintiff and contends that he was terminated from his job for legitimate nondiscriminatory reasons.

Thereupon arise the issues which must be determined by the Court. After full consideration of the pleadings, evidence, briefs and arguments of counsel the Court now enters its findings and conclusions.

The Plaintiff is a black adult male citizen of the United States and a resident of Catawba County, North Carolina.

The Defendant is a municipality and at the times complained of in the complaint was the Plaintiff's employer. Also, the Defendant is a person within the meaning of 42 U.S.C.A. § 1981, and an employer within the meaning of Title VII.

Plaintiff was hired by the Defendant's police department on July 11, 1976, as a patrol officer, and his employment was terminated by the Defendant on January 19, 1979. Twice during this period the Plaintiff was given routine evaluations by his superior officers and both were satisfactory. During the time Plaintiff was an employee of the Defendant, Plaintiff was married to a white woman and the Defendant's employees knew of Plaintiff's inter-racial marriage.

Throughout the time of Plaintiff's employment, Defendant had a duly-adopted personnel ordinance, setting forth various acts which were grounds for dismissal or demotion, including incompetency, inefficiency, inexcusable neglect of duty, insubordination, dishonesty, inexcusable absence without leave, misuse of public property and other similar acts. The department head involved, in this instance the Chief of Police, had discretion as to the action to take as to any violations of any of the standards; any demotion had to be approved by the City Manager; any disciplinary action resulting in a suspension, demotion or dismissal could be the subject of a requirement that the employee be given a conference and written decision by the department head, and upon dissatisfaction with his answer, the employee had the right to appeal the department head's decision to the City Manager, whose decision would be final. All hearings or conferences were to be held during working hours, and an employee was allowed to be accompanied and assisted by a representative of his choice in following this grievance procedure.

The Plaintiff was disciplined by the Defendant as follows:

1. On September 5, 1978, Plaintiff requested to take off the day of September 16, 1978, to attend his wife's company picnic. On the day requested, other officers had already applied and been granted permission to take the day off, and the Plaintiff could not be allowed off without leaving the department shorthanded for its minimal manning requirements; Plaintiff's supervisor told the Plaintiff that he could

not be off on that day unless he secured some other man's agreement to come in on his day off and replace him, which Plaintiff was unable to do. Plaintiff had previously swapped vacation time with a white officer but this white officer would not agree to swap days off with the Plaintiff. Plaintiff's request for the day off was denied, but Plaintiff deliberately chose to stay home, stating that he would "suffer the consequences." Plaintiff was charged with inexcusable absence without leave and was suspended four days without pay. He did not appeal this suspension.

2. On September 1, 1974, the Chief of Police had instituted a policy on the type of responses police officers should give to certain signals from the radio dispatcher, running from the lowest priority Code 0 to the emergency Code 3. It appears that Code 3 allowed use of blue lights and sirens to obtain the right of way and allowed violation of traffic laws without recklessness. Code 2 allowed use of blue light, but not siren, and required the officer to get to the scene as quickly as possible with safety, by observing all traffic laws. Some officers from time to time violated this policy by a very short use of the siren at an intersection. On September 26, 1978, the Plaintiff received a Code 2 call and, while responding to it, speeding thirty-five to forty miles per hour in a twenty-five mile per hour zone, and prior to reaching an intersection where the light was red for his lane of travel, turned on his siren, ran the red light and struck a vehicle traveling through the intersection on the green light. He was suspended three days for upgrading his code responses, speeding and running the red light and having the accident, which caused substantial damage to both vehicles.

3. The Defendant had a written policy requiring police officers who had confiscated materials to be used as evidence to turn the same over to the property officer for official safekeeping. Although the policy had been in effect a long time, it had not been enforced until the fall of 1978, when it was reinforced by a new statement of the policy by a new Chief of Police. Other police officers had failed to turn in confiscated property as required, and the property officer would learn of it and would ask them to turn the property in, and if they would do so, he would not fill out a report slip on them. On October 1, 1978, Plaintiff arrested a suspect for carrying a concealed weapon, a .38 special revolver and, as of the week of November 28, still had the same in his possession. The property officer saw the Plaintiff in court with the weapon and told him he had better turn it in. The Plaintiff refused to do so and, on December 7, 1978, Plaintiff was given an official reprimand for failure to properly inventory and submit confiscated property. Plaintiff did not appeal this reprimand.

4. On November 28, 1978, the Plaintiff was patrolling in the northeastern section of the city and, following custom, notified the radio dispatcher that he desired to go to a restaurant approximately thirteen blocks out of his assigned area, in the southwestern section of town, to eat supper; this request, as was customary, was granted. Following supper, Plaintiff informed the radio dispatcher by radio that he was back on duty, but instead of proceeding directly back to his assigned area, he proceeded approximately seventeen blocks north to his home in the northwestern quadrant of town to retrieve a key to his new house, which was in the mailbox. Then he drove back south several blocks and then turned and drove east for several blocks, heading back toward his assigned area. He then received a Code 1 call to investigate a routine matter in his assigned area. While continuing toward his assigned area and while still approximately six blocks from it and while going at a speed of approximately thirty-five miles per hour in a thirty-five mile per hour zone, the Plaintiff ran a red light and struck another automobile in the intersection, which had entered on the green light, causing substantial damage to both automobiles. The particular red light which the Plaintiff ran on this occasion had been installed about two weeks before, and at each roll call at the police department on each shift, the officers had been warned to pay particular attention to the red light, since it

was a new one. The Plaintiff was suspended for thirty days as a result of violating the vehicle control signal, violating traffic laws while responding to a routine call for service, unauthorized absence from assigned patrol area and exceeding the posted speed limit, with the thirty-day suspension to be effective December 10, 1978. The Plaintiff did not appeal this suspension.

5. City of Hickory Police Department policy was that officers on suspension who had court appearances scheduled were still required to come to court and were paid for those days when they came to court. The Plaintiff appeared in court on December 19, 1978, to testify against a defendant who failed to appear, and the Plaintiff requested the court to reschedule the case for January 16, 1979. On January 15, 1979, the court liaison officer, following her usual procedure, telephoned the Plaintiff to remind him of his scheduled appearance in court at 9:30 a. m. the next day. At approximately 8:00 a. m. on January 16, 1979, the Plaintiff contacted the court liaison officer and asked her to request a continuance of the case because he was not feeling well and was unable to come to court. He stated that if the judge or district attorney objected to the continuance, he could be reached by telephone at his home; that Plaintiff then went to the Hickory Municipal Airport, several miles away, where he held an approved part-time job loading and unloading baggage, and worked at that job. By the time he finished work and left the airport, it was after 9:30 a. m. The court liaison officer suspected he would be working at his part-time job and informed the internal investigation officer, who informed the Chief of Police. The Chief of Police ordered the internal investigation officer to go to the airport and see if Pope was working at his part-time job. He did so, and shortly after he arrived at the airport he saw the Plaintiff leave. The Plaintiff went home and went to bed. The internal investigation officer reported back to the Chief of Police that the Plaintiff had worked at his job at the airport that morning, and the Chief then terminated the Plaintiff's employment as of January 16, 1979 for neglect of duty and fictitious illness.

The Plaintiff requested a hearing before the Chief of Police, and a full hearing was held, with sworn testimony being offered and the City Attorney and Plaintiff each asking questions of witnesses and with the Plaintiff offering his own testimony. The Plaintiff was not represented by legal counsel, although he could have been so represented. The evidence was transcribed by a court reporter and was tape recorded by the Plaintiff. The Chief of Police affirmed his previous dismissal of the Plaintiff, and the Plaintiff appealed to the City Manager, who considered the matter on the evidence already presented without the taking of other evidence, but upon allowing the Plaintiff to present his argument as to why the ruling should be reversed. The Plaintiff did not exercise his right to be represented by counsel at this hearing. The City Manager affirmed the dismissal of the Plaintiff by the Chief of Police. Thereafter, the Defendant offered to allow the Plaintiff to resign his position voluntarily, which would have the effect of clearing his record of the involuntary dismissal and would also allow him to collect for thirteen days of accrued vacation leave that he would not receive if involuntarily terminated. The Plaintiff refused to do this.

■ Plaintiff contends that he was discriminatorily treated because he allegedly received more severe disciplinary punishment than white officers who committed similar violations. The Court will now examine these purported instances of disparate treatment.

As previously mentioned Plaintiff failed to report to work on September 16, 1978 and was suspended for four days. Jerry Berry, a white police officer, is said to have also failed to report to work on a scheduled work day but was only suspended for two days. While there is no evidence concerning the circumstances surrounding Officer Berry's absence, there is testimony that Plaintiff intentionally refused to report to work on September 16, 1978 despite his knowledge that the force would be one man

short. At trial Plaintiff seemed more upset about the fact that the white officer whom he had previously switched days off with would not return the courtesy. Even if Officer Berry had only received two days suspension instead of four one fact must be pointed out, Officer Berry eventually left his position with the Defendant's police force. Unlike the Plaintiff who acquired five disciplinary infractions before being terminated, Officer Berry's record only included charges of failing to report to work as scheduled and two suspensions. When he received his third disciplinary violation he was allowed to resign, had he refused he would have been involuntarily discharged.

Plaintiff asserts that white police officers who were involved in automobile accidents while on duty were not as severely disciplined as was the Plaintiff. In an effort to prove this proposition the Plaintiff has cited four examples.

On December 28, 1978, Thomas Feaser, a white police officer, hit a light pole in the parking lot of a shopping center. The patrol car was damaged and Officer Feaser was suspended for three or four days and required to attend a driver's improvement clinic. This accident occurred when Officer Feaser was attempting to place the radio microphone back onto the hanger on the dash and he momentarily looked away from the roadway and hit the unlit pole.

Mike Bentley, a white police officer, had an accident on October 6, 1978 when he entered an intersection against the traffic light. Even though his patrol car was damaged he was not disciplined for this accident.

Jerry D. Barrett, a white police officer was involved in a minor automobile accident on November 8, 1976. Detective Barrett was backing up a steep graded driveway into the street and because of the grade of the driveway, was unable to see a vehicle parked on the other side of the street. The bumper of the police car merely struck the passenger door of the parked car. Detective Barrett was not disciplined for this accident.

Lastly, Darrell Patton, a white police officer, had an automobile accident on October 14, 1978. Even though Patton was not disciplined he received a traffic citation for following too close. His police car received minor damage when he ran into the rear of the car in front of him.

On the basis of these four instances the Court fails to find that the Defendant has intentionally discriminated against the Plaintiff. Feaser was in fact suspended and ordered to attend a driving clinic. As a result of this accident and two other infractions, failure to appear in court and sleeping on duty, Feaser was allowed to resign, otherwise he would have been fired. Plaintiff accumulated five infractions before he left. The accidents which Barrett and Patton were involved in appear to be nothing more than minor "fender benders." The Plaintiff on the other hand had two serious accidents involving the running of red lights. Even though the Defendant has not offered further evidence concerning Bentley's accident, the fact remains that he had one major accident and the Plaintiff had two.

The final alleged discriminatory disciplinary treatment involves Plaintiff's failure to appear in court. Plaintiff contends that Thomas Feaser was found guilty of the same offense yet he was only suspended for one day. The Court does not find this to be evidence of discriminatory treatment either. As stated before Feaser was forced to resign after receiving his third disciplinary offense.

The Court recognizes the fact that when an employee is discharged by his superior a myriad number of factors must be considered when meting out the punishment. Separate employees do not always receive the exact same discipline. The significant fact in this case is the Defendant appeared to have tried even harder with the Plaintiff than some of the other employees. Feaser and Berry were asked to resign after accumulating only three offenses. During the period of Plaintiff's employment there is no evidence of any officer with as many infractions as the Plaintiff. Consequently,

the Court concludes that there is no evidence of Plaintiff being discriminated against in terms of discipline.

■ Next the Plaintiff contends that he was discriminated against when he was denied a shift transfer. On direct examination the Plaintiff testified that he had requested a transfer from second to first shift but never received it, instead three white officers with less seniority than Plaintiff got transfers to the first shift. In fact one of the Plaintiff's exhibits which was admitted into evidence illustrates this point. However it also shows that Plaintiff and these three white employees were hired within ten months of one another. More importantly though the exhibit states why the white officers received the transfers. Two were transferred in order to enable them to continue their education. The third, who was hired less than a month after the Plaintiff, was transferred because he had family problems. Plaintiff merely testified that he desired a transfer because he preferred the hours of the first shift. Again, this Court does not find that the Defendant discriminated against the Plaintiff. Instead the Court finds that the white officers were transferred for legitimate, nondiscriminatory reasons.

■ As previously stated, Plaintiff has presented claims of discrimination in discipline and transfer on account of his race and inter-racial associations. This Court has found that Plaintiff was not discriminated against on the basis of his race and therefore the question remains concerning his inter-racial associations. Plaintiff contends that his superiors did not approve of his marriage to a white woman and therefore he was discriminated against. However the Plaintiff has not presented any evidence in support of this contention. In fact one of the Plaintiff's own witnesses, Michael H. Hurley, Plaintiff's former supervisor, testified at trial that he considered Plaintiff's inter-racial marriage to be a "plus" to him in performing his duties as a patrol officer. Another one of Plaintiff's white supervisors, Lt. Hathcock, testified that while he did not personally favor inter-racial marriages he did not treat Plaintiff any differently on account of his. The Court therefore concludes that Plaintiff was not treated differently on account of his inter-racial associations.

■ The Defendant is prohibited by Title VII and § 1981 from discriminating against the Plaintiff or any other black employee. In order to establish a violation under the above provisions Plaintiff must show either a discriminatory impact of racially neutral practices or discriminatory treatment. See: *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 355 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In this case the Plaintiff is proceeding under both theories.

In *McDonnell Douglas Corp. v. Green, supra,* the Supreme Court set forth the basic allocation of burdens of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff must show by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving a prima facie case the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.,* 411 U.S. at 802, 93 S.Ct. at 1824. Third, if the defendant carries his burden, the plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for discrimination. *Id.,* 411 U.S. at 804, 93 S.Ct. at 1825.

This Court, in view of the factual findings it has made, does not conclude that the Plaintiff has made out a prima facie case of discriminatory treatment. The Plaintiff failed to show that whites under the same or similar circumstances were treated any differently from himself. Assuming arguendo that such proof had been submitted, the Defendant proceeded to show legitimate, nondiscriminatory reasons for discharging the Plaintiff. Furthermore, the subjective standards employed by the De-

fendant in disciplinary matters were applied within reasonable bounds of traditional management discretion and were not pretext for discrimination.

The Plaintiff has also sought to prove discrimination under the disparate impact theory. The Supreme Court has repeatedly held that a prima facie Title VII violation may be established by policies or practices that are neutral on their face and in intent but that nevertheless discriminate in effect against a particular group. *Nashville Gas Company v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977); *International Brotherhood of Teamsters v. United States, supra; General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *McDonnell Douglas Corp. v. Green, supra; Griggs v. Duke Power Co., supra.*

■ Establishing a prima facie case under this theory requires proof of an employment policy or practice which though facially neutral, imposes a substantially disproportionate burden upon a claimant's protected group as compared to a favored group within the whole set of persons to whom it is applied. *Nashville Gas Company v. Satty, supra; Griggs v. Duke Power Co., supra.* This policy or practice contemplated by the disparate impact theory consists of "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," and instead refers to an employer's "standard operating procedure—the regular rather than the unusual practice." *Wright v. National Archives and Records Service*, 609 F.2d 702 (4th Cir. 1979) quoting *International Brotherhood of Teamsters v. United States, supra.*

■ A claimant may establish, without elaborate statistical proof a prima facie disparate impact case. *Mitchell v. Board of Trustees of Pickens County*, 599 F.2d 582 (4th Cir. 1979); *Wright v. National Archives and Records Service, supra.* If a claimant succeeds in doing so then the burden of proof shifts to the defendant to show some "business necessity" as justification for the challenged policy. *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Griggs v. Duke Power Co., supra.*

■ In the present case the Plaintiff contends he has made out a prima facie case by showing that the Defendant's "facially neutral" policy of a standardless disciplinary system affected black officers more adversely than white officers. In particular the Plaintiff was allegedly discriminated against as a result of the Defendant's disciplinary system.

The Plaintiff further contends that the evidence of employment discrimination consists of racial epithets, racial jokes, the fact the supervisory force was exclusively white, and the statistical evidence. However, for the following reasons the Court finds and concludes that there is no evidence of any discrimination under the disparate impact theory.

The evidence does show that various members of the Defendant's police department, including white supervisors and both black and white patrolmen, engaged in the use of derogatory racial names and told racial jokes. Yet this does not necessarily mean that the Plaintiff was more severely disciplined than his fellow white officers.

Even though the Chief of Police had much discretion in disciplinary matters, it was not unlimited. In fact it was restricted by the various grounds set forth in the personnel ordinance of the city. In each instance when the Plaintiff was disciplined the facts clearly show that he violated Defendant's policies and standards, and except for the final order of termination Plaintiff never complained of any impropriety or racial discrimination.

■ In this case the Plaintiff has elected to introduce statistical evidence. When proving a prima facie case by statistics one must show a substantial deviation from that which would result from mere chance. *International Brotherhood of Teamsters v. United States, supra.*

■ None of the Plaintiff's evidence involves the number of black police officers and white police officers hired by the Defendant during the period of July 11, 1976 through January 19, 1979, Plaintiff's employment period with the Defendant. Nor was there any evidence of the number of disciplinary actions taken against black and or white police officers during this period.

What the Plaintiff's evidence does involve is the four year period from January 1, 1976 until December 31, 1979. During this time forty-seven white police officers were hired, of which twelve were suspended; and six black police officers were hired of which four were suspended. Of the four black officers suspended, two were first employed after Plaintiff had been discharged, and three of the white police officers suspended had either been employed before Plaintiff was discharged or after. Thus assuming the statistics for this four-year period are relevant the problem arises as to which of the individual employees to consider. Also it is not known what the result would be if consideration were given to all adverse disciplinary actions, including reprimands, demotions and discharges. Consequently, the Court must conclude from the uncertainty of the statistics and the small size of the sample that these statistics do not prove a disparate impact.

There being no evidence that the discipline imposed on the Plaintiff was other than justifiable and reasonable in view of his offenses, the Court holds that the Plaintiff has failed to prove discrimination either under the disparate treatment theory or the disparate impact theory. The Plaintiff's action shall be and the same is hereby dismissed.

A judgment in accordance with the above findings and conclusions shall be entered simultaneously herewith.