Mary Ann **CUNNINGHAM**, Plaintiff,

v.

**OWENS–ILLINOIS, INC.** and American Flint Glass Workers Union AFL–CIO, Defendants.

Civ. A. No. A:86–0545.

United States District Court, S.D. West Virginia, Parkersburg Division.

Sept. 24, 1987.

Joseph W. McFarland, Redmond, McFarland & Hague, Parkersburg, W.Va., for plaintiff.

Robert M. Steptoe, Jr., Steptoe & Johnson, Clarksburg, W.Va., for Owens-Illinois, Inc.

Lafe C. Chafin, Barrett, Chafin, Lowry & Hampton, Huntington, W.Va. and Richard A. Colasurd, Toledo, Ohio, for American Flint Glass Workers.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending for some time in this action have been the motions for summary judgment of the Defendants, Owens-Illinois, Inc. ("the Company"), American Flint Glass Workers

Union, AFL–CIO and Local Union 565 (collectively referred to hereinafter as "the Union"). The Plaintiff's difficulty with continuity of counsel delayed ruling on the motions. Having obtained new counsel, she has now responded to the dispositive motions.[1]

## I. *Background* [2]

The Plaintiff was employed on June 23, 1971, as a selector/packer at the Demuth Glass factory in Parkersburg, West Virginia. The factory was sold thereafter to Brockway, Inc. Owens-Illinois purchased the plant in 1984. The latter company, one of the Defendants herein, discharged the Plaintiff on September 6, 1985. She was informed of the decision on September 10, 1985.

The Plaintiff was a member of the local and international unions named as Defendants herein. The Union represented the glass workers at the Parkersburg facility. In November of 1983, Brockway, at that time the owner of the plant, entered into a three-year collective bargaining agreement with the Union. Owens-Illinois, as a successor corporation, recognized the Union and adopted the agreement. Hence, the Plaintiff was covered by a collective bargaining agreement at the time of her discharge.

The Company's stated reason for discharging the Plaintiff was her record of poor attendance.[3] From January 1, 1980, through August 26, 1984, the Plaintiff had seven leaves of absence for a total of 287 missed days of work. During that time span the Plaintiff received one written warning for excessive absenteesim and nine verbal warnings for excessive absenteeism, late reports and no reports. The Plaintiff received a second written warning on August 30, 1984. Also, Donald Frantz, Industrial Relations Director at the plant, counseled the Plaintiff on her absentee problem and its possible underlying causes. Nevertheless, between August 30, 1984, and September 6, 1985, the date of her discharge, the Plaintiff had sixty-two days of sick and personal leave and fourteen days of leave on five other occasions.

The Plaintiff contends that her absences were due to poor health and that they were documented by proper medical excuses. Believing that her employment had been unjustly terminated, the Plaintiff went to Dorothy Amick, a local union officer. Amick suggested that the Plaintiff file a grievance. This was done on September 12, 1985, two days after the Plaintiff learned of her discharge. Thereupon the Union proceeded to prosecute the grievance through four steps of the grievance process. The final step of the process was arbitration. The Union refused to take the grievance to arbitration. The Plaintiff was informed of this decision on February 14, 1986.

On April 8, 1986, the Plaintiff filed a complaint in the Circuit Court of Wood County, West Virginia, alleging breach of the collective bargaining agreement by the Company; breach of the duty of fair representation by the Union; and sex and age discrimination by all the Defendants in violation of the West Virginia Human Rights Act. The action was then removed to this Court by the Defendants.

## II. *Discussion*

### A. *The Hybrid Action*

This type of action, where an employee sues both the employer and the union pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, has been termed a hybrid action. It is essentially two suits in one. The employee sues the employer for breaching the collective bargaining agreement. Collec-

---

1. The Court commends the Plaintiff's counsel, Mr. McFarland, for his willingness to provide representation in this case. The illness of the Plaintiff's original counsel left the Plaintiff without representation for a period and delayed the resolution of the action. Mr. McFarland stepped into the breach. Unfortunately the Court's determination on the merits leaves his labor without reward.

2. The following facts, undisputed for the most part, are taken without further attribution from the briefs of counsel.

3. The attendance record of the Plaintiff covered her employment with all three employers.

tive bargaining agreements, however, usually provide an exclusive, nonjudicial dispute resolution mechanism for disputes arising thereunder. (Such is the case here.) The union is the employee's representative in this mechanism. Therefore, the employee also sues the union for breaching its implied duty of fair representation. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 555, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

The initial inquiry in this type of action will normally be one directed to whether the union breached its duty of fair representation. It naturally comes first because, as stated above, the employee must escape the exclusivity of the collective bargaining agreement by demonstrating that the system broke down and failed to serve its purpose. Having done so, the employee can then litigate his claim that the employer breached the contract. There are occasions, however, when a court can look beyond the allegations of unfair representation and examine the circumstances of the purported contractual breach. If the employer was not guilty of a breach, the employee cannot be heard to complain of the failings of his representation. It is akin to harmless error.

1. *Breach of the Collective Bargaining Agreement*

■ The Plaintiff's principal claim for breach of contract rests upon the following provision found in the collective bargaining agreement:

"The intent of this section [dealing with discharge and release] is not to penalize those employees who, through no fault of their own, suffer a prolonged illness, but rather it is to correct those employees and where necessary discipline those employees, whose records indicate a pattern of chronic and repeated absences over a period of time. An employee on an approved sick leave of absence will not be subject to the provisions of this section provided there are valid and acceptable reasons for such leave. Repeated sick leaves over a reasonable peri-

od of time will be viewed in the same manner."

Article 8, Section 2b of the collective bargaining agreement. The Plaintiff contends that she was protected by this contractual provision since her sick leaves were approved. The Court disagrees.

A plain reading of the above section indicates that the Plaintiff was not entitled to absolute protection. The section does provide protection to workers who miss work because of illness, but the language is in the singular. The intent of the section, as explicitly stated, is not to penalize those workers who "suffer *a* prolonged illness" or are on "*an* approved sick leave of absence." (Emphasis added). What of workers who experience several illnesses or repeated sick leaves? The contract says that they shall be treated in the same manner provided that the absences are "over a *reasonable* period of time." (Emphasis added). The Court must view this unambiguous language as a compromise of the respective interests of the Union and the Company. The Company agreed not to discipline workers who missed a period of work due to illness. On the other hand, it reserved to itself the right to protect its interests in stability and dependability in the workforce when a worker's repeated absences adversely affected that interest.

The Plaintiff's attendance record here was objectively poor. For whatever reason, the Plaintiff missed a high percentage of work days. The Company has offered uncontradicted evidence that her absenteeism was a burden on the Company as well as her co-workers. The Court must conclude that the Company was justified in the action that it took.

■ The Plaintiff also contends that the Company breached Article 8, Section 1b of the collective bargaining agreement in that it did not suspend her prior to discharge. The section relied upon provides as follows:

"No employee shall be summarily discharged. In all cases in which the Company concludes that an employee's conduct may justify discharge, he shall be suspended initially for not more than three (3) working days. The shop steward of Local Union shall be notified with-

in twenty-four (24) hours of such suspension. During such suspension period, the Company will meet with the Union and review the facts of the case. At the end of the suspension period, the Company will notify the Local Union of its final action and the grievance procedures can be invoked immediately."

The Company would appear to be in technical breach. Nevertheless, it is a breach without consequence here. As discussed, the Company had good cause to terminate the Plaintiff. If it had suspended her prior to discharge, the net effect would be the same. The Plaintiff would have been without pay and the grievance procedure would have been invoked in essentially the same manner. The Plaintiff has established no prejudice flowing from this inconsequential breach.

■ Finally, the Plaintiff asserts that the Company breached the collective bargaining agreement by not adhering to the time guidelines established for the grievance procedure. By her calculation, the grievance procedure's initial four steps should have been completed by October 17, 1985. Her complaint would have then been ready for arbitration. In reality, however, the Plaintiff was not notified until February 14, 1986, that the Union had decided to forego arbitration. This delay, contends the Plaintiff, was a breach of the collective bargaining agreement's express terms.

As to this final argument of the Plaintiff, the Court notes that the Plaintiff in effect accuses both the Union and the Company of a contractual breach. The Court believes that neither party breached the contract. It is true that the contract sets a precise timetable for resolving grievances. That does not mean, however, that the parties cannot agree to extend the time frames. Extensions of time are routinely encountered in all types of litigation. The Company and the Union represent that extensions were agreed upon in this case. The Plaintiff states that she did not agree to any extensions and did not waive the time frame. That is of no moment, however, because the Union, as her representa-

tive, could properly make such an agreement.

The Court thus concludes that the Plaintiff's claims of breach of contract by the Company are without merit. As discussed initially, this conclusion also relieves the Union of liability since any failing of representation would be in a vacuum. Nevertheless, as further support for the Court's ruling, a discussion of the allegations concerning the Union is offered.

## 2. *The Duty of Fair Representation*

■ In determining whether a union breached its duty of fair representation, a court may not necessarily give controlling weight to the merits of the claim for contractual breach.[4] Rather, the focus is on the actions of the union. Nevertheless, utilization of a sliding scale, whether consciously used or not, is unavoidable. Certainly, a union, as the exclusive bargaining agent, should treat all of its members equally. Nevertheless, a union may be expected to tailor its effort to match the merit of the claim. Minimal effort on a frivolous claim would not be a failure of the representational duty, whereas similar steps taken on a clearly meritorious claim might be.

With regard to the instant litigation, the law is clear that unless a union's decision is arbitrary, discriminatory, or made in bad faith, its judgment not to take a complaint to arbitration should not be second guessed. *Ash v. United Parcel Service*, 800 F.2d 409 (4th Cir.1986). The union naturally has limited resources. It must give priority to those claims it believes meritorious. It must balance the interest of the membership as a whole with those of the individual member. A union which would take every grievance to arbitration regardless of the merit does harm to its own integrity and that of the system. Undue interference with the union's judgment would create an atmosphere where procedural effort was favored over substantive merit. Everyone would lose.

Upon a review of the undisputed facts, the Court finds that the Union, giving def-

**4.** Of course, as discussed, where there is no breach of contract, any failure of the duty of fair representation by the union is not actionable.

erence to its judgment, properly balanced the interests at stake here. The Plaintiff argues that the Union "failed to raise several contract defenses or advance reasonable and legitimate arguments in support of [her] grievance." Although using the plural, the Plaintiff identifies only one argument which the Union did not raise: The failure of the Company to suspend the Plaintiff prior to discharge. As discussed earlier, this claim was of a technical nature and was of little benefit to the Plaintiff.

The Court concludes that the Union did not breach its duty of fair representation. It made a considered decision not to take the Plaintiff's grievance to arbitration. Absent perfunctory treatment, *Stevens v. Teamsters Local 600*, 794 F.2d 376 (8th Cir.1986), or reckless disregard of the member's rights, *Ash v. United Parcel Service*, 800 F.2d 409 (4th Cir.1986), the Court will not question the judgment of the Union.

## B. *The Discrimination Claim*

The Plaintiff claims that the Company and Union discriminated against her on the basis of her age and sex. She sues under the provisions of the West Virginia Human Rights Act, *W.Va.Code*, § 5–11–9.

■ The Plaintiff correctly points out that "[t]o establish a prima facie case for such discrimination, [she] must show that she is a member of the class protected by the West Virginia Human Rights Act ..., that she was discharged or forced to resign, and that a person not intended to be protected by the Act was treated more favorably than she." Plaintiff's memorandum at 12 (citing *State ex rel State Human Rights Commission v. Logan-Mingo Area Mental Health Agency, Inc.*, 329 S.E.2d 77 (W.Va.1985)). Under this standard, the Plaintiff fails to raise an issue of fact as to her prima facie case.

The Plaintiff clearly falls within both protected classes: age and sex. She fails, however, to raise an inference that she was treated less favorably than others outside those classes. She compares herself to ten other workers. Seven of those ten are

women. This statistic simply does not allow the Plaintiff to raise an inference of discrimination. Likewise, the Plaintiff raises no inference of age discrimination. She does not provide the ages of those workers to whom she compares herself. In short, the Plaintiff has suffered a failure of production on an issue for which she would have had the burden of proof at trial.[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ The Plaintiff uses affidavits of four former co-workers in an attempt to establish disparate treatment or discrimination. The affidavits demonstrate that the other workers did not receive verbal warnings or discipline for taking sick leave. If the affidavits are directed toward the Union, they are ineffective. The Union did not take the action detailed in the affidavits; the Company did. The co-workers describe their treatment by the Company. Hence, the affidavits establish no discrimination by the Union in processing the Plaintiff's grievance.

■ Likewise, if the Plaintiff wishes to demonstrate that she was treated differently by the Company, a materiality problem arises. If the labor contract is not breached and if public policy is not violated, nothing prohibits an employer from treating its employees differently. As discussed earlier, the employer did not violate the labor contract by discharging the Plaintiff. And, as is now apparent, it did not discriminate against the Plaintiff on the basis of her age and sex. Even assuming arguendo that the Plaintiff has established a prima facie case of discrimination, her case does not survive the Defendants' motions.

The West Virginia Supreme Court has adopted the burden-shifting scheme for employment discrimination cases formulated by the United States Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). That scheme has been described as follows:

---

5. Of course, the Plaintiff is not limited to the above model in establishing a prima facie case. *Taylor v. City National Bank*, 642 F.Supp. 989 (S.D.W.Va.1986). She may use direct evidence of discrimination to raise the necessary inference. She has not done so.

"In an action to redress unlawful discriminatory practices in employment and access to 'place[s] of public accommodations' under the West Virginia Human Rights Act, *as amended, W.Va.Code, 5–11–1 et seq.*, the burden is upon the complainant to prove by a preponderance of the evidence a prima facie case of discrimination.... If the complainant is successful in creating this rebuttable presumption of discrimination, the burden then shifts to the respondent to offer some legitimate and nondiscriminatory reason for the rejection. Should the respondent succeed in rebutting the presumption of discrimination, then the complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext for the unlawful discrimination. Syl. pt. 3, in part, *Shepardstown VFD v. West Virginia Human Rights Commission,* —— W.Va. ——, 309 S.E.2d 342 (1983)."

*Montgomery General Hospital v. West Virginia Human Rights Commission,* 346 S.E.2d 557, 560 (W.Va.1986) (*quoting* Syl. pt. 1 of *State ex rel State Human Rights Commission v. Logan-Mingo Area Mental Health Agency, Inc.,* 329 S.E.2d 77 (1985)). This Court held in *Taylor v. City National Bank,* 642 F.Supp. 989 (S.D.W.Va.1986) that when a defendant employer articulated a legitimate, nondiscriminatory reason for discharge, the plaintiff must establish, at least at the summary judgment stage, the existence of a genuine issue of material fact as to whether the reason was pretextual. The employer here has articulated a legitimate nondiscriminatory reason for the Plaintiff's discharge—her record of poor attendance. Likewise, the Union has asserted that this poor record led it to believe that arbitration would be futile. The Plaintiff does not offer any evidence to rebut these nondiscriminatory reasons.

### III. *Conclusion*

In summary, the Court finds that there are no genuine issues of material fact extant on the current record and that the Defendants are entitled to judgment as a matter of law. The Court will enter judgment accordingly.

The Clerk is directed to send a certified copy of this Memorandum Opinion and Order to counsel of record.