Dennis William **GILBERT**, Plaintiff,

v.

**PENN–WHEELING CLOSURE CORPORATION,**
Defendant.

**Civil Action No. 5:95CV32.**

United States District Court,
N.D. West Virginia,
Wheeling Division.

March 13, 1996.

---

**20.** The foregoing conclusion makes it unnecessary to reach the other issues raised by the Coalition and North Carolina.

J. Douglas Austin, Austin & Henry, Pittsburgh, PA, for plaintiff.

Ronald M. Musser, William A. Kolibash, Phillips, Gardill, Kaiser & Altmeyer, Wheeling, WV, Jacqueline Damm, Julia A. Martin, Tammy D. McCutchen, Matkov, Salzman, Madoff & Gunn, Chicago, IL, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION AND SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

STAMP, Chief Judge.

### I. *Procedural History*

On March 15, 1995, plaintiff Dennis William Gilbert ("Gilbert") filed this civil action against defendant Penn–Wheeling Closure Corporation ("Penn–Wheeling") alleging breach of contract and race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964. On April 12, 1995, Gilbert amended his complaint and added a claim for race and sex discrimination in violation of the West Virginia Human Rights Act. On May 26, 1995, Penn–Wheeling filed its answer to the amended complaint. Discovery closed in this action on November 30, 1995.

On December 22, 1995, Penn–Wheeling filed its motion for summary judgment pursuant to Fed.R.Civ.P. 56 alleging that there are no genuine issues of material fact and that, therefore, Penn–Wheeling is entitled to summary judgment in its favor as a matter of law. Gilbert filed his response to Penn–Wheeling's motion on January 4, 1996. Thereafter, Penn–Wheeling filed its reply on January 11, 1996. Additionally, on that same date, Penn–Wheeling filed a motion for leave to file a supplemental motion for summary judgment on Count I of the amended complaint. On January 17, 1996, this Court granted Penn–Wheeling's motion and on January 18, 1996, Penn–Wheeling filed its supplemental motion for summary judgment on Count I of the amended complaint. Gilbert did not file a response to that motion.

This Court has now considered Penn–Wheeling's motion and supplemental motion for summary judgment, the memoranda filed in support thereof and in opposition thereto, the pleadings filed and the applicable case law. For the reasons stated below, this Court finds that Penn–Wheeling's motion and supplemental motion for summary judgment should be granted.

### II. *Uncontested Material Facts*

Penn–Wheeling, a manufacturer of metal caps and closures, hired Gilbert, a white male, as a press operator on or about May 20, 1991. Gilbert served a sixty-day probationary period and had approximately four weeks of training. During his training and probationary period, Penn–Wheeling considered Gilbert to be a very satisfactory new

employee, and he received above average evaluations during his training period.

Penn–Wheeling has a written progressive disciplinary policy known as the "Plant Rules." The Plant Rules were in effect during the time that Gilbert was an employee at Penn–Wheeling. On May 20, 1991, Gilbert certified that he had received, read and understood the Plant Rules.

The Plant Rules establish four classes of violations: Class 1, Class 2, Class 3 and Class 4. Class 1 violations are the most severe violations and will result in discharge. Class 1 violations include intentional acts resulting in serious injuries to others and disorderly conduct. Class 2 violations are punishable by a three-day suspension for the first offense and a discharge for the second offense. Class 2 violations include "defective or careless workmanship causing excess scrap or rework, willful waste of materials and supplies." Class 3 violations result in a written warning for the first offense, a three-day suspension for the second offense and discharge for the third offense. Class 3 violations include failure to be in place and ready to begin work at the designated starting time and failure to meet production standards and/or quality standards. Class 4 violations are the least severe violations of the Plant Rules and result in a verbal warning for the first offense, a written warning for the second offense and disqualification from a job classification for the third offense. Class 4 violations include failure to perform assigned work satisfactorily.

Producing defective caps can constitute either a Class 2 violation, a Class 3 violation or a Class 4 violation of the Plant Rules. David F. Reed, the Vice President and General Manager of Penn–Wheeling at the time Gilbert was an employee of Penn–Wheeling, conducted investigations when defective caps were produced to determine if the production of the caps was a Class 2, Class 3 or Class 4 violation. Generally, Reed would interview the employee and the employee's supervisor. Reed would then review the circumstances of the violation, including the quantity of the defective product, the type and severity of the defects, the degree to which the press operator was responsible for the defects,

whether the operator discovered the defects, the costs of the defect to the company and any extenuating circumstances. Reed would keep contemporaneous notes of his investigations and disciplinary decisions, and memos and disciplinary notices were placed in the employee's permanent file. It was not unusual for an employee to run defective caps and the production lines would often malfunction. Not every instance of bad production was deemed by Reed to be a violation of the Plant Rules.

In addition to the Plant Rules, Penn–Wheeling has a separate, written absence and tardy policy. Under the absence and tardy policy, employees receive a written verbal warning for four unexcused absences or occasions of tardiness, a written warning for five unexcused absences or occasions of tardiness, a three-day suspension for six unexcused absences or occasions of tardiness, and suspension pending discharge for seven unexcused absences or occasions of tardiness.

Subsequent to Gilbert's probationary period, his level of performance changed. Five to six months after he started working for Penn–Wheeling, Gilbert began to have absentee problems. His supervisor noticed a deterioration in Gilbert's job performance. On November 8, 1991, Gilbert received his first disciplinary notice in the form of a written warning for being "out of the plant at lunch time without clocking out—clocking in from lunch time late." This disciplinary notice warned Gilbert that the penalty for the next offense would be suspension. On May 15, 1992, Gilbert received a second disciplinary notice which was a written verbal warning for "accumulat[ing] unexcused absences/tardies in excess of the plant guidelines." Gilbert had unexcused absences on March 13, 1992 and March 14, 1992 and unexcused tardiness on April 15, 1992 and April 24, 1992.

On August 14, 1992, Gilbert met with Reed to review Gilbert's attendance record. At the meeting, Reed told Gilbert that his attendance record "was totally unacceptable" and warned Gilbert that "if [Penn–Wheeling] did not see substantial consistent improvement in [Gilbert's] overall attendance within a reasonable period of time, [Penn–Wheeling]

would be forced to terminate his employment." According to the stipulation submitted by the parties to this Court on February 14, 1996, Gilbert's record showed two instances of tardiness, ten "absent" days and eight "left early" days at the time of the meeting between Gilbert and Reed.

On December 2, 1992, Gilbert received a three-day suspension because he ran defective caps. Gilbert had been operating a line running threaded caps. During Gilbert's shift, the press began to malfunction causing incomplete threads on a small percentage of the caps. Of approximately thirty-four cartons produced by Gilbert during his shift, approximately thirty-one cartons contained defective caps and had to be sorted. The defect level in each carton varied from 2.6% to 5.0% of the total caps produced. The press operator on the next shift, Karen Griffith, caught the defect after running four cartons of caps. She was not disciplined.

Reed found that this incident violated Class 2, Rule 3: "defective or careless workmanship causing excess scrap or rework, willful waste of materials and supplies." He did not classify the violation as a Class 3 or Class 4 violation because Gilbert ran the defective caps for his entire shift and never discovered them, the defect was caught by the press operator on the next shift after she had run only four cartons, and the defective caps cost Penn–Wheeling approximately $1,000.00 in sorting time and spoilage. The disciplinary notice warned Gilbert that "any further disciplinary actions over the next twelve months [would] result in the termination of his employment." On December 8, 1992, Gilbert filed a grievance with his union protesting the suspension. However, Gilbert's grievance of the suspension was not pursued after Penn–Wheeling's initial response denying the grievance.

Less than six months later, on May 11, 1993, Gilbert committed a second Class 2 violation. During Gilbert's shift, he ran a number of severely defective caps which were packed in boxes, sealed and put on skids ready to be sent to the customer. The first shift press operator running the same line on the morning of May 12, 1993 immediately noticed the defective caps being produced on the line, shut down the line, and notified the floor supervisor. Twenty of the seventy-nine cartons produced during Gilbert's shift were sorted over a period of approximately two days. The defective caps were inspected, and all defects were saved and categorized for severity. The sorting yielded 486, or about 2.6%, defective caps in total, which Penn–Wheeling determined to be an unacceptably high level of defect. Further, one hundred and twenty-five of the defective caps were grossly deformed caps exhibiting raw edges, incomplete shells and jagged edges. These caps were potentially harmful to consumers.

On May 14, 1993, Reed met with Gilbert, Gary Hall, Gilbert's floor supervisor during the shift, and two union representatives. Gilbert provided an explanation for the defective caps; however, Reed found that Gilbert's explanation was unsatisfactory and inconsistent. In addition, Reed determined that Gilbert had not met his responsibility as a line operator. Based on his investigation, Reed determined that the May 11, 1993 production of defective caps was a Class 2 violation. Because this was Gilbert's second Class 2 violation within a six-month period and because of his poor overall work record, Reed decided to discharge Gilbert on May 17, 1993.

Reed informed Gilbert of this decision, first by telephone and then by letter. On May 14, 1993, Gilbert filed a grievance with his union. Gilbert's grievance was not pursued after Penn–Wheeling's initial response denying the grievance.

At the time Gilbert was discharged for poor performance, thirteen of the twenty-three press operators at Penn–Wheeling were white females, seven were white males, two were black females and one was a black male. Reed and all the supervisors were white males. The three black employees at Penn–Wheeling at the time Gilbert was discharged were Lena Brown Clemont, Gerald Clemont and Donna Saunders. Lena Brown Clemont has been an employee of Penn–Wheeling since March 25, 1975, and has no disciplinary notices in her employee file. Gerald Clemont, a Penn–Wheeling employee since January 7, 1991, has four disciplinary

notices in his file. Three of the notices are for absences or tardiness and one notice was a written warning for running caps with split panels. According to Reed, the defects in the caps run by Clemont resulted in only minimal loss to Penn–Wheeling and only a written warning was necessary.

Donna Saunders was employed by Penn–Wheeling from February 1, 1976 to July 15, 1994. Saunders received a written verbal warning and written warning for accumulating unexcused absences or instances of tardiness. Further, Saunders was disciplined twice for bad production. She received a three-day suspension for production of nonconforming caps on November 22, 1994 and November 23, 1994. On July 15, 1994, she was discharged because of a second Class 2 violation. Saunders ran sixteen cartons of caps over 2.9 hours with an incorrect liner material. Her error caused approximately $1,000.00 of scrap.

None of the thirteen white female employees had a work record comparable to Gilbert's. Further, Michael S. Wilson, a white male who has worked for Penn–Wheeling since May 7, 1993, has received six disciplinary notices. First, Wilson received two written verbal warnings for unexcused absences or instances of tardiness. Second, Wilson received a written warning for being out of the plant at lunch without clocking out and clocking in from lunch late. Third, Wilson received a written verbal warning for running approximately 25,000 defective caps. Fourth, Wilson received a five-day suspension for producing thirty-eight cartons of defective caps which cost Penn–Wheeling $750.00 to $1,000.00. Finally, Wilson received a fifteen-day suspension for fighting.

III. *Summary Judgment Standards*

■ Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Id.* The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548,

2552–53, 91 L.Ed.2d 265 (1986). However, as the United States Supreme Court noted in *Anderson v. Liberty Lobby, Inc.,* Rule 56 itself provides that "a party opposing a properly supported motion for summary judgment 'may not rest upon mere allegations or denials of [the] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. *See also Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979) (Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law.") (*citing Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950)).

■ In *Celotex,* the Court stated that "the plain language of Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Summary judgment is not appropriate until after the non-moving party has had sufficient opportunity for discovery. *Oksanen v. Page Memorial Hosp.,* 912 F.2d 73, 78 (4th Cir. 1990). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

IV. *Discussion*

A. *Count I—Breach of Contract*

■ This Court finds that Gilbert's action for breach of contract is barred by the appli-

cable statute of limitations.[1] In *DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 169, 103 S.Ct. 2281, 2293, 76 L.Ed.2d 476 (1983), the United States Supreme Court held that the statute of limitations for an action by an employee against an employer for breach of a collective bargaining agreement is six months. In Count I, Gilbert charges that Penn–Wheeling violated the collective bargaining agreement between Penn–Wheeling and his union by terminating him rather than suspending him for the second Class 2 violation. Thus, this Court finds that the six-month statute of limitations applies to Gilbert's breach of contract claim. Gilbert was terminated from Penn–Wheeling on May 17, 1993. He filed his complaint on May 15, 1995, almost two years later. Accordingly, Gilbert's cause of action for breach of contract in Count I of the complaint is barred by the statute of limitations. Therefore, summary judgment is hereby GRANTED in favor of Penn–Wheeling upon Count I.

B. *Counts II and III—Violation of Title VII*

A plaintiff who alleges discriminatory discharge in violation of Title VII must prove that, but for his or her race or sex, the employer would not have taken the adverse employment action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* test, a plaintiff must first establish, by a preponderance of the evidence, a *prima facie* case of unlawful discrimination, which creates a rebuttable presumption. *St. Marys Honor Center v. Hicks,* 509 U.S. 502, 504, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407, 415 (1993) (citing *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 1093–1094, 67 L.Ed.2d 207 (1981)). Next, the defendant may rebut the presumption by articulating a legitimate non-discriminatory reason for its actions. *Id.* at 416. Once the defendant has offered a legitimate explanation, the presumption of discrimination drops away, and

the plaintiff must prove that the employer's proffered reason is pretextual and the adverse employment action was actually taken because of race or sex. *Id.* Although the *McDonnell Douglas* structure was developed to assist trial judges in evaluating evidence produced at trial, the Fourth Circuit has applied this three-step proof scheme to summary judgment proceedings. *See e.g., Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1315–16 (4th Cir.1993) (applying *McDonnell Douglas* framework to an age discrimination claim at the summary judgment stage).

In *McDonnell Douglas,* the Supreme Court noted that "[t]he facts necessarily will vary in Title VII cases, and the specification ... of the *prima facie* proof required from [the plaintiff will vary] in ... respect to differing factual situations." *Id.* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. Accordingly, courts have modified the *McDonnell Douglas* formulation to address a wide range of discrimination claims. The Fourth Circuit has held that in cases where the plaintiff alleges discriminatory termination, the plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who were not members of the protected class were retained under apparently similar circumstances. *Hughes v. Bedsole,* 48 F.3d 1376, 1383 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 190, 133 L.Ed.2d 126 (1995).

This case also involves a claim of "reverse discrimination" because Gilbert is a white male alleging race and sex discrimination. While the Supreme Court has held that "Title VII protects whites as well as minorities," *Lucas v. Dole,* 835 F.2d 532, 534 (4th Cir. 1987), *cert. denied sub nom.,* 494 U.S. 1026, 110 S.Ct. 1471, 108 L.Ed.2d 609 (1990). (citations omitted), some courts have required that a plaintiff must make a showing in addition to the *prima facie* case in order to bring a reverse discrimination claim. For example, in *Parker v. Baltimore & Ohio R.R. Co.,* 652

---

1. This Court notes that Gilbert did not file a response to the supplemental motion for summary judgment filed by Penn–Wheeling. Pursuant to Local Court Rule 2.07(f), in effect at the time the supplemental motion was filed, Gilbert is deemed not to oppose the motion. Nevertheless, in accordance with *Custer v. Pan American Life Ins. Co.,* 12 F.3d 410 (4th Cir.1993), this Court will consider the merits of the supplemental motion.

F.2d 1012 (D.C.Cir.1981), the court required that in reverse discrimination cases, in addition to the *prima facie* test set forth above, a plaintiff must show "background circumstances that support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Id.* at 1017.

In *Lucas*, the Fourth Circuit expressly declined to decide whether the higher burden imposed in *Parker* would apply to reverse discrimination suits in the Fourth Circuit. 835 F.2d at 539. However, in *Lucas*, where the plaintiff, a white female, alleged that the defendant discriminated against her on account of race by failing to give her a promotion, the Fourth Circuit held that in failure-to-promote cases, the plaintiff is required to produce, in addition to showing the elements of a *prima facie* case, "*some other evidence* that ... race was a factor considered by [the] employer in not granting ... the promotion." *Id.* at 533 (citations omitted, emphasis added). While declining to expressly adopt the *Parker* standard for reverse discrimination, the court indicated its desire to impose a somewhat higher burden upon reverse discrimination plaintiffs and stated that "[t]he similarity of the burden imposed [by requiring the plaintiff to produce 'some other evidence'] and that imposed by the D.C. Circuit in reverse discrimination cases makes it unnecessary to reach the issue in this case." *Id.* at 534.

■ This Court finds that, based upon the decision in *Lucas*, the Fourth Circuit would require a plaintiff in a reverse discrimination case to come forth with additional evidence beyond that required to establish a *prima facie* case in a typical discriminatory termination action. Although this is not a failure-to-promote case, as was the case in *Lucas*, where the "some other evidence" standard articulated by the Fourth Circuit would apply, this Court finds that it would not be unreasonable to expect the Fourth Circuit to apply a standard similar to that articulated in *Parker* when looking at a discriminatory discharge claim that is based upon reverse discrimination. Therefore, this Court will apply the *Parker* standard to this reverse discrimination claim and require that Gilbert show, in

addition to the *prima facie* elements listed above, that "background circumstances support a suspicion that the defendant is that unusual employer who discriminates against the majority." *Parker*, 652 F.2d at 1017.

■ This Court finds that Gilbert cannot establish a *prima facie* case of discriminatory termination for three reasons. First, Gilbert has not shown that his job performance was satisfactory. Gilbert admits that his performance had deteriorated within five to six months after he started working at Penn–Wheeling. Gilbert admits that he received a written warning for failing to clock out at lunch time, that he received a written verbal warning for accumulating unexcused absences/tardies in excess of the plant guidelines, that he had been informed that his performance was below acceptable standards and that he would need to substantially improve his performance, that he received a three-day suspension for running approximately thirty-one cartons which contained defective caps, and that he committed a second violation of running defective caps during his employment with Penn–Wheeling. This Court finds that these admissions, standing alone, establish that Gilbert was not performing his job satisfactorily and that it was proper for Penn–Wheeling to terminate Gilbert pursuant to the Plant Rules.

■ Although Gilbert admits to his poor work performance, he accuses Penn–Wheeling of using a "subjective standard" in deciding whether to terminate him. In this same vein, Gilbert contends that the Plant Rules were not enforced on a consistent basis and that Reed acted based upon his own personal opinion in terminating Gilbert. This Court finds that as a matter of law, the use of discretion in termination is not equivalent to discrimination. In *Pope v. City of Hickory*, 541 F.Supp. 872, 878–79 (W.D.N.C.1981), *aff'd*, 679 F.2d 20 (4th Cir.1982), the court held that subjective standards in disciplinary matters are appropriate and create no grounds for a *prima facie* discrimination claim if the standards are "applied within reasonable bounds of traditional management discretion."

Here, although Reed applied the defendant's Plant Rules at his discretion, there is no evidence that Reed's application of the established disciplinary rules was outside the reasonable bounds of traditional management discretion. The evidence shows that, consistent with the Plant Rules, Reed characterized Gilbert's defective production incidents as Class 2 violations. Further, the warnings given to Gilbert by Reed as a result of his absenteeism and tardiness were consistent with the absence/tardy policy. Finally, the uncontested evidence shows that Reed conducted investigations into the bad production incidents to determine who was ultimately responsible for the inferior production. Accordingly, the fact that Reed used his discretion in applying the rules does not establish a *prima facie* case of discrimination.

The second reason that Gilbert cannot establish a *prima facie* case of discrimination is that Gilbert has not established that black or female employees were retained under circumstances similar to those surrounding Gilbert's termination. Gilbert presents only his own testimony, based upon hearsay, as evidence of the favorable treatment of blacks and females at Penn–Wheeling. In *Maryland Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991), the Fourth Circuit held that "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." Therefore, Gilbert cannot establish a *prima facie* case by merely introducing his own testimony concerning statements heard by Gilbert relating to favorable treatment of blacks and females at Penn–Wheeling. *See Mitchell*, 12 F.3d at 1315 ("When a plaintiff's case is presented under the *McDonnell Douglas* proof scheme in response to a defendant's motion for summary judgment, the plaintiff must present admissible evidence to establish a *prima facie* case."). Therefore, Gilbert has failed to establish that blacks or females were treated more favorably than him under similar circumstances.

Further, Gilbert's contention that Penn–Wheeling discriminated against white males in favor of blacks and females is directly refuted by the fact that Penn–Wheeling retained a white male employee, Michael Wilson, under circumstances similar to those surrounding Gilbert's termination. Wilson's retention as an employee in spite of his violations of the Plant Rules strongly supports Penn–Wheeling's contention that Gilbert's termination was not discriminatory. *See Hughes*, 48 F.3d at 1384. Accordingly, Gilbert has failed to present evidence which would create an issue of fact with regard to the fourth prong of the *McDonnell Douglas* test and Penn–Wheeling must prevail as a matter of law.

Finally, this Court finds that Gilbert cannot establish a *prima facie* case of reverse discrimination because he has failed to show any additional evidence or background circumstances which would support his reverse discrimination allegations. Gilbert has provided no evidence that would support a suspicion that Penn–Wheeling is the "unusual employer who discriminates against the majority." *Parker*, 652 F.2d at 1017. Gilbert has not shown that Penn–Wheeling has a history of terminating white males. In fact, the evidence shows that all of the supervisors at Penn–Wheeling are white males and that the work force at Penn–Wheeling is not disproportionally composed of blacks or females. Accordingly, Gilbert's reverse discrimination claims must fail upon this ground as well.

Further, even if Gilbert could establish a *prima facie* case of sex or race discrimination, Penn–Wheeling has articulated a legitimate non-discriminatory reason for discharging Gilbert, and Gilbert has not shown that the proffered reason was a pretext for race or sex discrimination. *See Hicks*, 509 U.S. at 506, 113 S.Ct. at 2747, 125 L.Ed.2d at 416. This Court finds that discharging an employee for violations of an established disciplinary policy is a legitimate non-discriminatory reason for such a discharge. *See e.g., Nelms v. Ross Stores, Inc.*, 853 F.Supp. 883 (M.D.N.C.1994) (absenteeism and poor job performance are legitimate non-discriminatory reasons for discharge); *Strickland v. Sears, Roebuck & Co.*, 693 F.Supp. 403 (E.D.Va.1988) (poor perfor-

mance is legitimate non-discriminatory reason for discharge); *Cunningham v. Owens–Illinois*, 669 F.Supp. 757 (S.D.W.V.1987) (poor attendance record is legitimate non-discriminatory reason for discharge). Further, "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate non-discriminatory reasons for an adverse employment action." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir.1989) (citing *Gairola v. Commonwealth of Virginia Dept. of Gen. Services*, 753 F.2d 1281, 1283 (4th Cir.1985)). Therefore, Penn–Wheeling's motion for summary judgment upon Gilbert's Title VII claims alleged in Counts II and III of the amended complaint should be and hereby is GRANTED.

### C. *Counts IV and V—West Virginia Human Rights Act*

■ Any claim under the West Virginia Human Rights Act, W.Va.Code § 5–11–1 *et seq.*, is subject to the same standards as those developed under Title VII. *See Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152, 159 (1995). Thus, for the same reasons as set forth above, Gilbert's claims of a violation of the West Virginia Human Rights Act in Counts IV and V of his amended complaint must fail. Accordingly, Penn–Wheeling's motion for summary judgment on the West Virginia Human Rights Act claims is GRANTED.

### V. *Conclusion*

For the foregoing reasons, Penn–Wheeling's motion for summary judgment and supplemental motion for summary judgment are GRANTED. It is ORDERED that this civil action be DISMISSED and STRICKEN from the active docket of the Court.

IT IS SO ORDERED.

The Clerk is directed to transmit copies of this order to counsel of record herein.