48 F.3d 1376
 67 Fair Empl.Prac.Cas. (BNA) 440,
66 Empl. Prac. Dec. P 43,518, 32 Fed.R.Serv.3d 310,
4 A.D. Cases 173, 9 A.D.D. 583, 6 NDLR P 155
 Sandra K. HUGHES, Plaintiff-Appellant,
v.
Morris BEDSOLE, both individually and in his official
capacity as Sheriff of Cumberland County, North Carolina;
James D. Bowser, both individually and in his official
capacity as a Major of the Cumberland County Sheriff's
Department; Cumberland County Sheriff's Department;
Cumberland County, North Carolina; Western Surety Company,
Incorporated, Defendants-Appellees.
Southern States Police Benevolent Association, Amicus Curiae.
 No. 94-1299.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 31, 1994.
Decided March 15, 1995.
 
 ARGUED: Robert James Willis, Raleigh, NC, for appellant. Joseph Michael McGuinness, McGuinness & Parlagreco, Elizabethtown, NC, for amicus curiae. Craig A. Reutlinger, Van Hoy, Reutlinger & Taylor, Charlotte, NC, Bobby Grey Deaver, Fayetteville, NC, for appellees. ON BRIEF: Philip M. Van Hoy, Van Hoy, Reutlinger & Taylor, Charlotte, NC, for appellees Cumberland County, Sheriff's Dept., Bowser, and Bedsole; Larry J. McGlothlin, Fayetteville, NC, for appellee Bowser.
 Before RUSSELL and HALL, Circuit Judges, and WILLIAMS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 Affirmed by published opinion. Judge RUSSELL wrote the opinion, in which Judge HALL and Senior Judge WILLIAMS joined.
 OPINION
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 Plaintiff-Appellant Sandra K. Hughes appeals the district court's decision dismissing on summary judgment her claims that her discharge from her position as a jail shift supervisor was unlawfully motivated by her sex, her exercise of her right to free speech, and her handicapped status. We affirm.
 
 I.
 
 2
 The Sheriff's Department of Cumberland County, North Carolina (CCSD), first employed Hughes in 1976 as a matron in the Cumberland County Jail. After eight and one-half years as a matron, she became a road patrol officer. While working on the road patrol on August 5, 1986, Hughes injured her right arm when she was involved in a car accident. The accident left her with a permanent injury to her arm diagnosed as "persistent lateral epicondylitis" (or "tennis elbow"). Joint Appendix (JA) at 308, 324-25. The injury restricted the type of work that Hughes could perform, but it did not prevent her from performing the essential functions of a full-time road patrol officer.
 
 
 3
 Hughes was promoted in March 1988 and became the first female sergeant and shift supervisor in the history of the Cumberland County Jail. Apparently dissatisfied with some of the working conditions at the jail, Hughes met with Reverend Norman Mitchell, the Chaplain of the Jail, in late February or early March, 1989. At the meeting, Hughes expressed concerns regarding understaffing at CCSD and the threat that this understaffing posed to the safety of persons housed or employed at the jail. She also discussed the improper training of certain jail personnel and complaints from some female employees about derogatory remarks made to them by male employees. Hughes arranged for other jail employees to meet with Mitchell and voice similar concerns. Mitchell relayed Hughes' concerns to Cumberland County Sheriff Morris Bedsole, whereupon Bedsole requested a meeting with Hughes and Mitchell to discuss the matters.
 
 
 4
 At some point before March 16, 1989,[1] Hughes and Mitchell met with Bedsole to discuss Hughes' concerns regarding understaffing, improper training, and derogatory remarks made by male employees to female employees. Bedsole was sympathetic to Hughes' understaffing concerns, but he told her that he could not hire more employees until the Cumberland County Commission approved the new CCSD budget. Bedsole assured her he would investigate into conditions at the jail, and he accepted two of Hughes' suggestions of employees who might serve as training officers to alleviate any training deficiency.
 
 
 5
 On March 16, 1989, a member of the jail ministry team left two jail catwalk doors unlocked during Hughes' shift. Bedsole suspended Hughes for three days without pay because of the incident. After being counseled by CCSD Major James D. Bowser about this security violation, Hughes admitted telling Bowser that "he could take her job and shove it," or words to that effect. JA at 99.
 
 
 6
 On March 24, 1989, a second incident occurred when a jail employee left a jail door unlocked during Hughes' shift. On March 27, 1989, in a meeting with Bedsole, Bowser, CCSD Major Richard Washburn, and George T. Franks, the Sheriff's Legal Advisor, Washburn informed Hughes that she was discharged. Hughes received a confirmation letter from Bedsole the next day. Neither Washburn nor Bedsole informed Hughes at the time specifically why she was fired, but Hughes later learned when she applied for unemployment compensation that Bedsole discharged her because of the two security violations involving unlocked doors that had occurred during her shift.
 
 
 7
 Other evidence before the district court at summary judgment demonstrated Hughes' attitude towards her working environment. For instance, between the two incidents of the unlocked doors, Hughes went to Washburn, her immediate superior, and asked that she be transferred to some other position even if it meant surrendering her sergeant's stripes. Leroy Park, another platoon sergeant at the CCSD jail, testified that during this same time, Hughes had turned sour against the department and was continually complaining to others about the working conditions at the jail.[2]
 
 
 8
 Following her discharge, Hughes filed a complaint with the Equal Employment Opportunity Commission (EEOC). The EEOC conducted an investigation and furnished Hughes with a right to sue letter. As part of the investigation, an EEOC investigator interviewed Bedsole. The EEOC file was destroyed, but Hughes filed in this action the affidavit of the EEOC investigator who interviewed Bedsole, in which the investigator attests to the accuracy of a copy of her handwritten notes attached to her affidavit. In her notes, the interviewer wrote that Bedsole said that CCSD "tried to get people to help [Hughes]" but that "there were problems on her shift" and that she "caused problems with some of her employees." JA at 232. The investigator also wrote that Bedsole said that Hughes "was not demoted because [he] couldn't put her back on the road (a lot of injuries) nor could she be put down into a jailer's position." Id. at 232-33.
 
 
 9
 On December 12, 1991, Hughes filed this action in the Eastern District of North Carolina against Defendants-Appellees Cumberland County, CCSD, Bedsole and Bowser, in their official and individual capacities, and the Western Surety Company, Inc., under 42 U.S.C. Sec. 1983, the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, 29 U.S.C. Sec. 794, Secs. 1, 12, 14, and 19 of Article I of the North Carolina Constitution, N.C.Gen.Stat. Sec. 58-76-5, and the North Carolina common law of wrongful discharge. Hughes complained that her recommendation for discharge and her actual discharge were unlawfully motivated by the exercise of her right to free speech concerning a matter of public concern, by her sex, and by the handicapped status of her right arm.
 
 
 10
 To support her claim, Hughes alleged in her affidavit that no other shift sergeant had ever been fired for an incident in which a jail employee left a door unlocked during the shift supervised by that sergeant. She produced specific CCSD personnel records demonstrating six incidents in which jail employees had left doors unsecured. The evidence details the one-day suspensions of the six jailers involved in five of the incidents but does not document any punishment, or lack of punishment, for the respective sergeants on duty. Hughes, however, did state in her affidavit that she knew "for a fact" that a male shift sergeant, who the parties stipulated was the sergeant on duty with respect to one of the incidents, did not suffer any disciplinary action resulting in loss of pay. Hughes also alleged that it was her "understanding" that none of the shift sergeants who were on duty when the incidents occurred were discharged or suspended with loss of pay for the incidents. JA at 307-08. Furthermore, she stated in her affidavit that she was the only sergeant who had spoken to Mitchell and Bedsole about the mismanagement of the jail.
 
 
 11
 On September 16, 1993, Appellees filed motions for summary judgment on all claims; and the district court heard the motions on December 29, 1993. During the hearing, the district court raised a number of factual issues sua sponte that Appellees had not identified in their summary judgment motion and supporting memorandum. The district court granted Appellees summary judgment on January 4, 1994. In dismissing Hughes' claims, the court relied on the absence of certain factual evidence on three of the four areas that were raised sua sponte by the Court during the December 29 hearing.
 
 
 12
 On January 6, 1994, Hughes filed a motion under Fed.R.Civ.P. 59(e) to alter or amend the judgment of the district court. Among other things, she attached to her motion a supplemental affidavit in which she attested to the existence of jury issues with respect to certain factual issues the court had raised sua sponte. The district court denied Hughes' motion by an order filed January 31, 1994, and expressly refused to consider any evidence that was not in the record "at the time of the rendition of the judgment" entered on January 4, 1994. JA at 524.
 
 II.
 
 13
 Hughes first complains that the district court committed reversible error by reviewing factual issues sua sponte in consideration of Appellees' summary judgment motion without giving her a reasonable opportunity to submit relevant previously-obtained evidence. The Supreme Court has held that the party moving for summary judgment must demonstrate that "there is an absence of evidence to support the nonmoving party's case," Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), and that once the moving party makes such a showing, the non-moving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). This Court has noted that this obligation of the nonmoving party "is particularly strong [as in this case] when the nonmoving party bears the burden of proof." Pachaly v. City of Lynchburg, 897 F.2d 723, 725 (4th Cir.1990). Regarding the authority of federal courts to enter summary judgment sua sponte, the Supreme Court has stated that "district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence." Celotex, 477 U.S. at 326, 106 S.Ct. at 2554.
 
 
 14
 In this case, the district court notified Hughes at the December 29 hearing that it would consider sua sponte the adequacy of her evidence on her sex discrimination claim, her free speech claim, and her related claim against Bowser.[3] The court inquired as to what evidence Hughes could produce that Bedsole fired her for exercising her free speech rights and what evidence she could produce to establish her claims of disparate treatment on the basis of her sex. The court informed Hughes that it would consider these issues even though Appellees had not raised them in their summary judgment motion. When Hughes claimed that she had no notice that these issues would be raised at summary judgment, the court offered to grant her additional time to produce any evidence she had.[4]
 
 
 15
 Given the court's offer, Hughes' claim is misleading that she had no notice until the district court issued its order that the court might rely on issues not raised by Appellees. From the transcript of the hearing, Hughes did not explicitly accept or decline the offer but merely responded with "arguments" regarding whether the Court was precluded from addressing those issues sua sponte. See JA at 420. As noted above, district courts clearly have the power to raise such issues sua sponte, and we hold that the district court properly put Hughes on notice under the standard in Celotex.
 
 
 16
 For similar reasons, we hold that the district court did not abuse its discretion under Rule 59(e) by refusing to amend its judgment based upon evidence Hughes submitted to address the evidentiary concerns the court raised sua sponte. See Temkin v. Frederick County Commissioners, 945 F.2d 716, 724 (4th Cir.1991) (reviewing district court's denial of 59(e) motion for abuse of discretion), cert. denied, 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992). As reasoned above, the district court properly raised the factual concerns and allowed Hughes an opportunity for additional time to present supplemental evidence before the Court on the issues raised sua sponte. Hughes did not take the opportunity before summary judgment was entered and only proceeded to introduce previously-obtained evidence to meet her burden with respect to disparate treatment, a major deficiency noted by the district court in its January 4, 1994, Order. Hughes' supplemental affidavit supporting her 59(e) motion presented evidence that the same male sergeant who was not disciplined for one unlocked door incident was also not disciplined when a second incident occurred while he was the sergeant on duty.
 
 
 17
 In RGI, Inc. v. Unified Industries, Inc., 963 F.2d 658, 662 (4th Cir.1992), this Court held that a district court did not abuse its discretion in refusing to consider a supplemental affidavit in support of a 59(e) motion after the district court reasoned that the litigant had offered "no justified reason" why the additional material was not presented earlier. Accord Cray Communications, Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 395-96 (4th Cir.1994) (holding that district court did not abuse discretion in denying 59(e) motion when litigant's only justification for not presenting supplemental evidence earlier was that its lawyer thought it was "unnecessary"), cert. denied, --- U.S. ----, 115 S.Ct. 1254, 131 L.Ed. 2d 135 (1994). Similarly, given our conclusion that Hughes had notice of the issues the district court would consider in granting summary judgment and given Hughes' admission that she had the evidence before summary judgment, Hughes presents no justification for not submitting the supplemental affidavit before summary judgment. We therefore conclude that the district court did not abuse its discretion in refusing to consider the supplemental evidence in Hughes' Rule 59(e) motion.[5]
 
 III.
 
 18
 Hughes next complains that the district court committed reversible error by granting Appellees summary judgment on her various discrimination and free speech claims. We review the district courts' granting of summary judgment de novo, Wagner v. Wheeler, 13 F.3d 86, 90 (4th Cir.1993), and consider facts and inferences drawn from the facts in the light most favorable to Hughes, the party opposing the motion, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); Ross v. Communications Satellite Corp., 759 F.2d 355, 364-65 (4th Cir.1985). We conclude that the district court properly dismissed Hughes' claims on summary judgment.A. Sex discrimination claim
 
 
 19
 On appeal, Hughes first alleges that Appellees wrongfully discharged her on the basis of her sex in violation of the public policy enunciated in the North Carolina Equal Employment Practices Act, N.C.Gen.Stat. Sec. 143-422.2.[6] The district court dismissed Hughes' claim based upon its determination that Hughes had not presented any evidence "from which a reasonable jury could find that the plaintiff was discharged because she was a woman." JA at 482.
 
 
 20
 Given the similar language and underlying policy of Sec. 143-422.2 and Title VII, 42 U.S.C. Sec. 2000e et seq., the North Carolina Supreme Court has explicitly adopted the Title VII evidentiary standards in evaluating a state claim under Sec. 143-422.2 insofar as they do not conflict with North Carolina statutes and case law. North Carolina Dep't of Correction v. Gibson, 308 N.C. 131, 301 S.E.2d 78, 82-85 (1983). Thus, in order to demonstrate a prima facie case of disparate treatment under Sec. 143-422.2, Hughes must show by a preponderance of the evidence that: (1) she is a member of a protected class; (2) she was qualified for her job and her job performance was satisfactory; (3) she was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. See Gibson, 301 S.E.2d at 82-83; see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 & n. 13, 93 S.Ct. 1817, 1824 & n. 13, 36 L.Ed.2d 668 (1973); Cook v. CSX Transp. Corp., 988 F.2d 507, 511-12 (4th Cir.1993). Hughes must thus eliminate concerns that she was fired because of her performance or qualifications, two of the most common nondiscriminatory reasons for any adverse employment decision. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-54, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981).
 
 
 21
 If Hughes presents a prima facie case, Appellees can rebut her case by producing evidence of legitimate, nondiscriminatory reasons for the dismissal. If Appellees make this showing, Hughes must prove by a preponderance of the evidence that Appellees' proffered reasons are pretext. Id. at 255, 101 S.Ct. at 1094; Gibson, 301 S.E.2d at 84. From these standards, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253, 101 S.Ct. at 1093, quoted in Gibson, 301 S.E.2d at 83. On top of these evidentiary standards for sex discrimination, at the summary judgment stage, Appellees must demonstrate that no genuine issue of material fact exists and, in turn, Hughes must present evidence from which a rational jury might conclude that Hughes was discharged because she is a woman. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 & n. 10, 106 S.Ct. 1348, 1355-56 & n. 10, 89 L.Ed.2d 538 (1986).
 
 
 22
 To support her claim, Hughes presents evidence that Major Washburn told Hughes on the day she was discharged that the Sheriff's office had no other openings for her when, in fact, CCSD personnel records demonstrated that CCSD had a vacant Deputy II position in its Road Patrol Division. Hughes also presents evidence of other actions taken against jail employees responsible for unlocked door incidents, including evidence that a male staff sergeant was not reprimanded after employees discovered that jail doors were left unlocked during his shift in two separate instances.[7]
 
 
 23
 Because Appellees have produced evidence supporting the legitimate, nondiscriminatory reason that Hughes was discharged due to her security violations, Hughes must present evidence creating a genuine issue of material fact regarding whether Appellees' proffered reasons are pretext. See Gibson, 301 S.E.2d at 84. Taking the evidence in the light most favorable to Hughes, we affirm the district court's conclusion that Hughes has not produced evidence sufficient to withstand summary judgment. Although Hughes' evidence is sufficient to establish a prima facie case, her evidence does not create a genuine issue of material fact regarding whether Appellees' proffered reasons are pretext.
 
 
 24
 Hughes' evidence that she was discharged even though a road patrol position remained open does not create a jury question on sex discrimination because she produced no evidence that a male responsible for similar security violations filled the position. Hughes also has failed to produce any evidence of prior remarks or actions on the part of Bedsole that would imply that he discriminated against her because of her sex. Furthermore, evidence before the district court at summary judgment demonstrates that male and female employees were treated more leniently than Hughes for security violations involving unlocked doors. Hughes' evidence of discipline of other jail employees shows that two female jailers were given one-day suspensions without pay when it was discovered that each of them left a jail door unlocked. More relevant to Hughes' discipline as a staff sergeant who supervises jailers, the EEOC notes introduced by Hughes recount that Bedsole stated that Marsha Hutchinson, another female staff sergeant, received only a 30-day probation for "leaving doors unlocked." JA at 235.
 
 
 25
 This evidence that a female staff sergeant was treated more leniently than Hughes largely undercuts her evidence that a male staff sergeant was not disciplined for two unlocked door incidents on July 19 and July 30, 1989. Although CCSD records and Bedsole's later statement to an EEOC investigator do not explain why the male sergeant was not disciplined for the July incidents, Appellees maintain that this apparent discrepancy in punishment was due to the fact that Hughes admitted her responsibility for the first security violation while the male sergeant did not so admit his responsibility.[8] In contrast to the male sergeant, Hughes testified that she told her supervising officer that she "would have to take the blame" for the unlocked door incident. Hughes Deposition II, November 10, 1992, at 58. She also testified that it "slipped [her] mind as far as getting up and going and checking" the doors because she was busy with paperwork and because she thought another jail employee was going to check the doors. Id. at 63-66.
 
 
 26
 Hughes thus offers no evidence that the specific factual circumstances surrounding her security violations, as well as her overall performance at that time, were substantially similar to those of the male shift sergeant whom she cites as having received more favorable treatment. Cf. Cook, 988 F.2d at 511-12 (claimant failed to establish prima facie case of discrimination because evidence demonstrated that persons outside protected class were disciplined as severely and more severely than claimant). Additionally, the fact that a female staff sergeant was treated more leniently than Hughes further demonstrates that Hughes has failed to identify any jury issue as to whether Appellees' proffered nondiscriminatory reasons for Hughes' discharge were pretext. We therefore affirm the district court's decision that Hughes' evidence on sex discrimination is deficient and fails to establish sufficient evidence to withstand Appellees' motion for summary judgment.
 
 B. Free speech claim
 
 27
 In the alternative, Hughes pursues on appeal her claims under the common law of wrongful discharge, 42 U.S.C. Sec. 1983, and Article I, Secs. 12 and 14 of the North Carolina Constitution[9] that she was unlawfully discharged for exercising her right to free speech under the United States and North Carolina Constitutions. It is clearly established that public employees have a First Amendment right not to have their employment conditioned upon refraining from constitutionally protected speech. Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); Wagner v. Wheeler, 13 F.3d 86, 90 (4th Cir.1993). In Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court outlined the inquiry courts must use to determine whether a public employee was unconstitutionally discharged for exercising free speech rights. Under this inquiry the employee has the initial burden of demonstrating that her free speech was a "substantial" or "motivating factor" in the adverse employment decision. Id. at 287, 97 S.Ct. at 576. The employee also bears an initial burden to demonstrate that her speech was constitutionally protected, i.e., that her speech involved a matter of "public concern" and that her interest in commenting on the matter of public concern outweighed the public employer's interest in promoting the efficiency of the public services it provides. Id. at 283-87, 97 S.Ct. at 574-76; Rankin, 483 U.S. at 383-85, 107 S.Ct. at 2896-97. If the employee meets this initial burden, the burden shifts to the public employer to show by a preponderance of the evidence that the employee would still have been discharged in the absence of the protected speech. Mt. Healthy, 429 U.S. at 287, 97 S.Ct. at 576.
 
 
 28
 Hughes recounts the conversations at issue with Mitchell and Bedsole in her original complaint and in testimony during her first deposition. When asked about the conversation with Mitchell, Hughes responded during her deposition:
 
 
 29
 A: I spoke to him about things that were bothering me at that time, such as: not having enough people to work with, basically stress....
 
 
 30
 Q: Did you say anything else to Rev. Mitchell that you can recall?
 
 
 31
 A: About all the shifts being overworked. There was lax in the security on a lot of the platoons. Other than that ...
 
 
 32
 Q: Did Rev. Mitchell ask you any questions?
 
 
 33
 A: He listened and he told me, he said, "Sandy, you know there's nothing I can personally do about it, but with your permission, I think the Sheriff needs to be made aware of this. I would like to take this to the Sheriff, explain to him what is going on, but I need your permission to do that."
 
 
 34
 I told him, I said, "If you feel that it will help, by all means. Because we've got to have some help and some relief up here." That's where my conversation ended with him.
 
 
 35
 JA at 100-01. When asked during her deposition about what she told Bedsole, Hughes stated:
 
 
 36
 I mentioned the being short handed, people that we had not being trained properly, the lax in security. He said he understood all of the problems. As far as the people right now, his hands were tied until they worked out the new budget.
 
 
 37
 JA at 108. She stated that she also told Bedsole that some of the male jail employees were making derogatory sexual slurs to female employees.
 
 
 38
 The district court predicated its decision on finding that the issues Hughes raised in her meetings with Mitchell and Bedsole were not of the type of public concern for which public employees are afforded constitutional protection. The district court thus did not base its holding on whether Hughes' speech was a substantial or motivating factor behind her discharge. Many courts reviewing such free speech claims, however, have addressed the public concern analysis after it is clear that the employee's free speech was a substantial factor behind the discharge. See, e.g., Rankin, 483 U.S. at 382-84, 390, 107 S.Ct. at 2895-97, 2900; Stroman v. Colleton County Sch. Dist., 981 F.2d 152, 156 (4th Cir.1992). We do not reach the issue of whether Hughes' speech involved a matter of public concern because we hold that Hughes has not set forth specific facts raising a genuine issue of material fact regarding whether her speech was a substantial or motivating factor behind her discharge.[10] See, e.g., Wagner, 13 F.3d at 91 (employee's claims do not withstand summary judgment under Mt. Healthy analysis because employee had not raised a genuine issue of material fact as to whether employee was discharged in retaliation for speech); Goldsmith v. Mayor & City Council of Baltimore, 987 F.2d 1064, 1071 (4th Cir.1993) (same); O'Connor v. Chicago Transit Auth., 985 F.2d 1362, 1368-71 (7th Cir.1993) (same), petition for cert. filed, --- U.S.L.W. ---- (U.S. July 12, 1993) (No. 93-5212); Cusson-Cobb v. O'Lessker, 953 F.2d 1079, 1081 (7th Cir.1992) (same); cf. O'Connor v. Steeves, 994 F.2d 905, 913 (1st Cir.) (plenary review applies to Mt. Healthy motivation determination at summary judgment stage), cert. denied, --- U.S. ----, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993).
 
 
 39
 Although the district court did not hinge its decision on Appellees' motivation, the court did make some "observations" suggesting that Hughes failed to demonstrate a jury issue on the question of whether Appellees' decision to discharge Hughes was motivated by an intent to retaliate for her free speech.[11] The court first noted that Hughes was discharged following her admitted security violation and another security violation occurring within a few days of the first incident. The court further observed that Bedsole had agreed with Hughes that additional personnel were needed and that no evidence demonstrated that Bedsole harbored any animus due to Hughes' speaking to Mitchell outside the chain of command. JA at 480.
 
 
 40
 In the midst of these observations by the district court, Hughes contends that her claim should survive summary judgment because she was discharged within a few weeks after she first pursued her matters with Mitchell and Bedsole. Hughes cites several cases to support her contention that this temporal proximity demonstrates sufficient retaliatory motivation. None of the cases on which Hughes relies, however, involve the Mt. Healthy standard of proof, which is applicable in this case. For instance, Hughes cites as supporting authority this Court's decision in Williams v. Cerberonics, Inc., 871 F.2d 452 (4th Cir.1989). In Williams, this Court held that a temporal connection between the employee's protected activity and her discharge was sufficient to establish causation necessary for a prima facie claim of retaliatory discharge under Title VII. To establish her prima facie case, however, the claimant in Williams was required to demonstrate only a "causal connection" between the protected activity and the adverse action. Id. at 457. In contrast, the Mt. Healthy standard requires Hughes to demonstrate that her speech was a substantial or motivating factor.
 
 
 41
 Given the different standard in this case, the holding in Williams is nevertheless instructive in how this Court addressed the merits of the claimant's Title VII charge. After the court in Williams held that the claimant had demonstrated a prima facie case, the court held that the claimant did not ultimately prevail in her retaliatory discharge claim. The court reasoned, "mere knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee." Williams, 871 F.2d at 457; see also Wagner, 13 F.3d at 91 ("[T]emporal proximity ... is simply too slender a reed on which to rest a Section 1983 retaliatory discharge claim.").
 
 
 42
 The undisputed evidence in this case demonstrates that Hughes accepted the responsibility for leaving a jail door unlocked in one incident and that another unlocked door incident occurred while she was on duty a few days later. Hughes was suspended without pay after the first incident and was discharged after the second. Appellees declare that Hughes was discharged based on these two security violations, and Hughes offers no evidence of any comments Bedsole or Bowser made that imply that Hughes was discharged for expressing her concerns to Mitchell and Bedsole.[12] The parties agree that Bedsole maintained an "open door policy," and as the district court observed, the record demonstrates no animus between Bedsole and Hughes because Hughes met with Mitchell outside the chain of command.[13] Furthermore, during their conversation, Bedsole agreed with Hughes' concerns about the need for security personnel. Given the lack of any direct evidence of retaliatory intent, Hughes relies on the temporal connection between her free speech and her discharge and on the evidence noted above in discussing her sex discrimination claim, in which a male sergeant, who did not so exercise his free speech rights, was not punished when he was the shift sergeant on duty during two incidents of unlocked jail doors.
 
 
 43
 We conclude that this evidence does not create a genuine issue of material fact as to whether Hughes' expressing her concerns about understaffing and improper training was a substantial or motivating factor behind her discharge. Considering Appellees' legitimate, nondiscriminatory reasons and the absence of any evidence of animus by Bedsole on account of Hughes' free speech, we hold the basic facts of the temporal connection and the male sergeant's receipt of no punishment after two similar security violation do not create a jury issue. We thus conclude that, as a matter of law, the evidence does not prove that Hughes' speech was a substantial or motivating factor in Appellees' decision to discharge her.
 
 C. Handicap discrimination claim
 
 44
 Hughes also appeals her claim that she was unlawfully discharged because of the epicondylitis, or "tennis elbow," she suffers on her right arm. She brings her claims under the Federal Rehabilitation Act of 1973, 29 U.S.C. Sec. 701 et seq.,[14] and she primarily relies upon notes an EEOC investigator took during an interview with Bedsole after Hughes' discharge. In the notes, the investigator wrote that Bedsole said that Hughes "was not demoted because [he] couldn't put her back on the road (a lot of injuries) nor could she be put down into a jailer's position." JA at 232-33.
 
 
 45
 In order to establish a handicap discrimination claim, Hughes must first offer evidence that she is qualified as an "individual with a disability" under the Rehabilitation Act. See 29 U.S.C. Sec. 794(a). The Act defines an "individual with a disability" as any person who "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. Sec. 706(8)(B). The corresponding federal regulations further define "major life activities" as "functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. Sec. 1613.702(c).
 
 
 46
 Hughes has made no showing that her arm condition constitutes such a disability. To support her claim, Hughes cites cases in which courts have considered individuals with certain muscle and joint conditions to be handicapped for purposes of the Rehabilitation Act. The claimants in these cases suffered from more restricting conditions than Hughes' epicondylitis; and moreover, this Court has held that the question as to whether an individual meets the statutory definition of handicapped is best suited to a "case-by-case determination," Forrisi v. Bowen, 794 F.2d 931, 933 (4th Cir.1986) (quoting E.E. Black, Ltd. v. Marshall, 497 F.Supp. 1088, 1100 (D.Haw.1980)). We have framed the proper inquiry as "whether the particular impairment constitutes for the particular person a significant barrier to employment." Id.
 
 
 47
 In this case, Hughes does not maintain that her epicondylitis substantially limits a major life activity as she alleges that she was fully capable of performing her tasks as jail staff sergeant and road patrol officer without any significant restrictions. See JA at 148-49. Furthermore, this Court has reasoned that the Rehabilitation Act's reference to substantial limitation indicates "that an employer regards an employee as handicapped in his or her ability to work by finding the employee's impairment to foreclose generally the type of employment involved." Forrisi, 794 F.2d at 935. Hughes has failed to offer specific evidence to show that her arm condition bars her from seeking other employment in her field or that Bedsole considers her barred from law enforcement generally. See Gupton v. Virginia, 14 F.3d 203, 204-05 (4th Cir.) (rejecting claim under Rehabilitation Act because employee failed to show that an allergy to tobacco smoke foreclosed her opportunity to obtain jobs in her respective field), cert. denied, --- U.S. ----, 115 S.Ct. 59, 130 L.Ed.2d 17 (1994). We therefore conclude that the medical diagnosis of Hughes' epicondylitis is insufficient to establish that her condition renders her legally handicapped under the Rehabilitation Act.
 
 
 48
 Moreover, Sec. 794(a) of the Rehabilitation Act requires a claimant to demonstrate that the discharge was "solely by reason of her or his disability," 29 U.S.C. Sec. 794(a); and Hughes has failed to establish a jury question on the issue of whether she was discharged solely because of her handicap. See Little v. F.B.I., 1 F.3d 255, 259 (4th Cir.1993) (holding that claimant failed to show that he was terminated solely because of handicap). Hughes' only evidence to support handicap discrimination is the EEOC notes described above, and these notes do not rebut Appellees' assertions that Hughes was discharged for her security violations.[15] Thus, we affirm the district court's granting Appellees summary judgment on Hughes' claim of handicap discrimination.
 
 IV.
 
 49
 For the foregoing reasons, we affirm the decision of the district court dismissing Hughes' claims on summary judgment.[16]
 
 
 50
 AFFIRMED.
 
 
 
 [1]
 The evidence in the record is unclear as to whether this meeting occurred before or after Hughes' three-day suspension. The exact date of this meeting, however, is immaterial to our decision in this case; and we adopt Hughes' recollection of the date for the purpose of reciting the facts
 
 
 [2]
 Contrary to any implications in Hughes' reply brief, we may consider Park's testimony. Hughes filed Park's deposition before the district court on October 8, 1993, and the testimony was properly in the record. Pleading No. 68, filed October 8, 1993; see JA at 424-25. Moreover, portions of Park's testimony are recounted in the segments of Hughes' second deposition included in the joint appendix before this Court. JA at 135-36
 
 
 [3]
 Hughes also complains that the district court improperly dismissed her claims against Bowser in the face of her request for additional time to produce evidence regarding Bowser's liability. See JA at 460-61. The issue of Bowser's liability is not relevant to this appeal because we hold that the district court correctly dismissed all of Hughes' claims at summary judgment
 
 
 [4]
 The transcript reads:
 [Hughes' attorney]: I would submit that it doesn't preclude the Court from raising the issue su [sic] sponte. If we were given an opportunity to marshal evidence that the Court feels may not be in the record or protect the points we had, no notice would ever be raised.
 The Court: You are not telling me you were taken by surprise by the Court's inquiry and [sic] you need more time, then I'll give you more time.
 JA at 419-20.
 
 
 [5]
 The parties also debate whether the district court properly considered the testimony of Deputy Sheriff John Tyndall, who testified in a nameclearing evidentiary hearing for Hughes. Hughes argues that the court improperly considered the testimony. The court's opinion, however, indicates that the court construed the evidence in Hughes' favor and accepted Tyndall's assertions as true. It appears that the court discounted the testimony because it concluded that the testimony did not demonstrate the occurrence of any riot or disturbance at the jail and thus did not establish that Hughes' speech was of public concern. See JA at 479
 
 
 [6]
 This statute reads in pertinent part:
 It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.
 N.C.Gen.Stat. Sec. 143-422.2. This statute does not provide for a specific statutory remedy, and we therefore analyze Hughes' claims under the North Carolina common law of wrongful discharge. See Iturbe v. Wandel & Goltermann, Technologies, Inc., 774 F.Supp. 959, 962-63 (M.D.N.C.1991), aff'd, 23 F.3d 401 (4th Cir.1994); cf. Coman v. Thomas Mfg. Co., 325 N.C. 172, 381 S.E.2d 445, 447-48 (1989) (establishing a public policy exception to the employment at will doctrine under North Carolina law). The specific statutory remedy for state employees under N.C.Gen.Stat. Sec. 162-36 does not apply to Hughes because she was an employee of CCSD.
 We need not address Hughes' claims of sex discrimination under the Fourteenth Amendment, 42 U.S.C. Sec. 1983, and the North Carolina Constitution. Hughes cannot bring a claim directly under the Fourteenth Amendment because it does not create a cause of action. Her claim under the Fourteenth Amendment merges into her Sec. 1983 claim because Sec. 1983 merely creates a statutory basis to receive a remedy for the deprivation of a constitutional right. See Zombro v. Baltimore City Police Dep't, 868 F.2d 1364, 1366 (4th Cir.), cert. denied, 493 U.S. 850, 110 S.Ct. 147, 107 L.Ed.2d 106 (1989). Hughes cannot bring an action under Sec. 1983 for violation of her Fourteenth Amendment rights because Hughes originally could have instituted a Title VII cause of action. See Great American Federal Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 372-78, 99 S.Ct. 2345, 2349-52, 60 L.Ed.2d 957 (1979) (holding that a Title VII violation could not be asserted by way of 42 U.S.C. Sec. 1985(3), the conspiracy counterpart to Sec. 1983); see also Zombro, 868 F.2d at 1366-71 (reasoning that Age Discrimination in Employment Act forecloses actions for age discrimination under Sec. 1983). Hughes initially filed a Title VII claim with the EEOC. The EEOC did not issue a determination letter on her charge, and instead issued Hughes a right to sue letter. Hughes, however, waived her right to sue under Title VII because she did not file this lawsuit within the time permitted. Appellees' Br. at 61 n. 9.
 Hughes' claim under the North Carolina Constitution similarly fails. A claimant whose state constitutional rights have been offended may pursue an action directly under the North Carolina Constitution only "[i]n the absence of an adequate state remedy." Corum v. University of N.C., 330 N.C. 761, 413 S.E.2d 276, 289 (1992), cert. denied, --- U.S. ----, 113 S.Ct. 493, 121 L.Ed.2d 431 (1992). In this case, Hughes has an adequate state remedy in her action for wrongful discharge in violation of the public policy in N.C.Gen.Stat. Sec. 143-422.2. See Alt v. Parker, 112 N.C.App. 307, 435 S.E.2d 773, 779 (1993) (holding that claimant could not maintain direct action under Article I, Sec. 19, because he had adequate state remedies), cert. denied, 335 N.C. 766, 442 S.E.2d 507 (1994).
 
 
 [7]
 Hughes produced the evidence of the second incident in her supplemental affidavit supporting her Rule 59(e) motion, and this Court is not obligated to consider affidavits and exhibits that were not before the district court when it made its decision. Kaiser Aluminum & Chem. Corp. v. Westinghouse Elec. Corp., 981 F.2d 136, 140 (4th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2339, 124 L.Ed.2d 250 (1993). This Court has nevertheless analyzed on appeal evidence offered in support of a 59(e) motion to determine whether affirming the district court's decision would result in a "miscarriage of justice." See id. at 140, 146-47. We will therefore consider Hughes' supplemental affidavit in reviewing the district court's summary judgment decision. In response to Hughes' 59(e) motion, Appellees also produced evidence to support their defenses. Given our summary judgment standard of considering the evidence in the light most favorable to the nonmoving party, however, we will not consider this additional evidence because Hughes timely objected to its introduction
 
 
 [8]
 See Oral Argument, Hughes v. Bedsole, No. 94-1299 (Oct. 31, 1994), in which Appellees stated that the evidence did not demonstrate one way or the other whether the male sergeant admitted any wrongdoing
 
 
 [9]
 The North Carolina Supreme Court has held that claimants may bring a direct cause of action under the North Carolina Constitution for alleged violations of "free speech rights." Corum v. University of N.C., 330 N.C. 761, 413 S.E.2d 276, 289-91 (1992). In its reasoning, the Corum court cited Article I, Sec. 14, of the North Carolina Constitution, which provides for the freedom of speech and press. The court did not cite Article I, Sec. 12, which provides for the right of assembly and petition, and it is unclear whether Corum supports a direct cause of action under Sec. 12. Because we hold that Hughes' free speech claims do not withstand summary judgment, we need not decide whether she could properly bring a claim under Article I, Sec. 12
 
 
 [10]
 Because we need not reach the issue, we express no opinion on whether Hughes' speech involved a matter of public concern
 
 
 [11]
 In its opinion, the district court held that it did not decide whether Hughes would not have been discharged "but for" her free speech, but the court did "observe" some facts regarding Appellees' motivation. JA at 480. This "but for" causation is actually the test Appellees would have to satisfy if Hughes first proved that her free speech was a substantial or motivating factor behind her discharge, Mt. Healthy, 429 U.S. at 287, 97 S.Ct. at 576; and we need not reach the "but for" test because Hughes has not satisfied this initial burden of proof
 
 
 [12]
 Hughes points to no conduct Bedsole exhibited towards her, other than the discharge itself, to show that Bedsole harbored any resentment to Hughes because she expressed her concerns about understaffing and improper training. This lack of evidence is one factor that distinguishes this case from Waters v. Churchill, --- U.S. ----, ----, 114 S.Ct. 1878, 1891, 128 L.Ed.2d 686 (1994), in which the Supreme Court concluded that the claimant had presented evidence of a genuine issue of material fact as to her employer's motivation behind her discharge
 
 
 [13]
 In fact, Leroy Park states in his deposition that Marsha Hutchinson, another female staff sergeant, met directly with Bedsole outside the chain of command. He added that he was not aware of any retaliatory action taken against Hutchinson as a result of this meeting
 
 
 [14]
 On appeal, Hughes also brings her handicap discrimination claim under the common law of wrongful discharge in violation of the public policy in N.C.Gen.Stat. Sec. 143-422.2. See note 6, supra. She did not present these grounds in her complaint before the district court. Because Hughes does not present sufficient reason to consider these new grounds, we need not address them on appeal. See Muth v. United States, 1 F.3d 246, 250 (4th Cir.1993) (court will consider issue raised for the first time on appeal "only in very limited circumstances, such as where refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice")
 
 
 [15]
 Furthermore, the EEOC investigator's parenthetical insertion of "a lot of injuries" suggests that Bedsole did not make the statement specifically in conjunction with his remarks on why Hughes was not demoted
 
 
 [16]
 Because we hold that Hughes' various discrimination and free speech claims do not survive summary judgment, we need not address the respective liability of the parties, and we affirm the district court's granting summary judgment to Western Surety upon finding that Bedsole did not breach any of his bond obligations under N.C.Gen.Stat. Sec. 58-76-5 (1989)
 Additionally, because the case of Robert R. Brewington v. Morris Bedsole and Cumberland County, Civ.A. No. 91-120-CIV-3-H (E.D.N.C. June 24, 1993), was not relevant to our decision, we deny the outstanding motion by amicus Southern States Police Benevolent Association, Inc., to supplement the record. For similar reasons, we deny amicus ' motion to file a reply brief. Amicus has no need to respond to Appellees' assertions regarding the Brewington litigation, and the other concerns amicus raises in its reply brief do not constitute sufficient cause to grant amicus leave of court to file a reply brief. See Fed.R.App.Proc. 28(c), 29.