UNITED STATES of America, Plaintiff,

v.

5709 HILLINGDON ROAD, CHARLOTTE, N.C., (Deed Book 5062, Page 119, Mecklenburg County Register of Deeds); a 1989 Ford Taurus VIN 1FAB52DOKG172210, Defendants.

No. 3:91CV190–P.

United States District Court, W.D. North Carolina, Charlotte Division.

March 21, 1996.

Charles W. Barkley, Charlotte, NC, Michael S. Scofield, Law Offices of Michael S. Scofield, Charlotte, NC, Hamlin L. Wade, Charlotte, NC, Vera S. Goudes, Charlotte, NC, for 5709 Hillingdon Rd., Curtis James Leak, TKC, Inc., Charlotte–Mecklenburg County Tax Collector.

Frank D. Whitney, U.S. Attorney's Office, Charlotte, NC, for plaintiff.

James F. Wyatt III, Charlotte, NC, John R. Cunningham, Charlotte, NC, for Karen Tinsley Leak.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on the Motion of the United States for Summary Judgment (document # 120) and the cross-motion of Claimant Karen T. Leak for Summary Judgment (document # 124). For the reasons stated herein, the Government's Motion will be granted, and Ms. Leak's Motion will be denied.

## I. *BACKGROUND*

Curtis J. Leak owns a nightclub called "Side Effects" here in Charlotte. His wife, Karen T. Leak, graduated with an accounting degree *summa cum laude,* is an accountant for Duke Power Company, and she has acted as the accountant for the corporation that owns her husband's night-club (he controls the corporation). The Leaks own the real and personal property that is the subject matter of this dispute. Essentially, the Government seeks forfeiture of this property because of its connection with the structuring of financial transactions to avoid the currency transaction reporting requirements.

The facts underlying the Government's case took place over January 17–18, 1991, when thirty-three deposits, all less than $10,-000, were made into accounts owned or controlled by Curtis James Leak or Karen T. Leak. The deposits, which totaled $152,000, were made into three different institutions. More specifically, $51,100 was deposited into Wachovia Bank & Trust, $50,700 was deposited into Southern National Bank, and $50,-800 was deposited into First Citizens Bank.

This deposit spree that occurred on January 17–18, 1991, took the following form. Eleven cash deposits, totalling $51,100.00 were made into a personal checking account of Curtis J. Leak, at Wachovia Bank, checking account No. 186155579. The deposits were made at ten (10) separate branches and the depositor(s) utilized eleven (11) different tellers. The deposit amounts were as follows: one (1) deposit I/A/O $5,200.00; eight (8) deposits I/A/O $5,000.00; one (1) deposit I/A/O $3,000.00; and, one (1) deposit I/A/O $2,900.00. Also, eleven (11) cash deposits, totalling $50,700.00, were made into a personal checking account of Curtis James Leak, checking account no. 251209540, at Southern National Bank. The deposits were made at five (5) different branches and the depositor(s) utilized eleven (11) different tellers.

The amounts of the deposits were as follows: nine (9) deposits I/A/O $5,000.00; one (1) deposit I/A/O $3,200.00; and, one (1) deposit I/A/O $2,500.00. Finally, eleven (11) cash deposits totalling $50,800.00 were made into a personal checking account of Karen T. Leak, checking account no. 0137099514, at First Citizens Bank. The deposits were made at seven (7) separate branches and the depositor(s) utilized eleven (11) different tellers. The amounts of the deposits were as follows: nine (9) deposits I/A/O $5,000.00; one (1) deposit I/A/O $3,000.00; and, one (1) deposit I/A/O $2,500.00.[1]

Twenty-two of these deposits were made into accounts held in the name of Curtis J. Leak, eleven of these deposits were made into the account of Karen T. Leak, the Claimant still before this Court.[2] According to Ms. Leak, she cannot remember exactly how many deposits she made during this two-day deposit spree in January of 1991, but admits to making at least a couple. We know too that a Ford Taurus registered in her name was identified and connected with several of these deposits, that one assistant manager at a Southern National Bank branch positively identified Karen Leak as a depositor, and that several other tellers gave descriptions of a depositor that closely resemble Ms. Leak.

We also know how the Leaks used the money provided by these deposits and we know that Ms. Leak participated in the disbursement of those funds. For on the day *before* the depositing spree began, three checks were drawn on these three accounts as follows: One check was drawn on the account of Curtis J. Leak from his account at Wachovia Bank. That check, number 940, was drawn in the amount of $50,680.54, bears the signature "Curtis J. Leak" and the lower

left corner of the check bears the note: "# 033634–7 **1 of 3**." A second check was drawn on the account of Curtis J. Leak from his account at Southern National Bank. That check, number 577, was in the amount of $50,680.54, bears the signature "Curtis J. Leak" and the lower left corner of the check bears the note: "# 033634–7 **3 of 3**." The third check was drawn on the account of Karen T. Leak from her account at First Citizens Bank. That check, number 337, was drawn in the amount of $50,680.54, bears the signature Karen T. Leak, and the lower left corner of the check bears the note: "# 033634–7 **2 of 3**." The Government has offered proof that Ms. Leak actually signed each of the three checks noted earlier, and Ms. Leak has not denied or otherwise rebutted the Government's evidence on this point. And we know that the number "033634–7" is the loan number for the mortgage on the property at Hillingdon Road, and as a result of their two-day deposit spree, the Leaks retired their mortgage on the defendant property by drafting three checks, one from each account, for a total of $152,041.62 [3]

## II. DISPOSITION

The Government and Ms. Leak have filed cross-motions for summary judgment. According to the Government, there is no genuine dispute concerning whether Ms. Leak was aware of, and participated in efforts to evade, the currency transaction reporting requirements. According to Ms. Leak, there is no evidence from which a reasonable juror could find that she had any knowledge of the reporting requirement, and therefore, she is entitled to her interest as an innocent owner as a matter of law.

1. Later in May there were a similar series of deposits totalling some fifty thousand dollars. These transactions serve to confirm that the Leaks were deliberately avoiding the reporting requirements, but they are not directly relevant to the claims here, and therefore, they will not be discussed at length.

2. The Court has already granted the Government's motion for summary judgment as to the claim of Mr. Leak and his corporation, TKC, Inc., because there was no genuine dispute concerning his knowledge of, and attempts to avoid,

the currency transaction reporting requirement. As noted in this Court's earlier ruling, a bank teller had previously explained that requirement to a very irate Mr. Leak before the deposit spree at issue.

3. While the checks are dated January 16, 1991, prior to the deposits, the accounts did not contain sums sufficient to honor these checks prior to the deposits at issue, and none of the checks were presented until after the deposits were completed.

### A. Probable Cause, Substantial Connection and Structuring.

 Both parties seek summary judgment pursuant to Fed.R.Civ.Proc. 56. "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) *citing* Fed. R.Civ.Proc. 56(c). However, Rule 56 does not require the moving party to produce evidence negating an opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2553. That is, "under *Celotex,* 'the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case.' " *Cray Communications v. Novatel Cmptr. Systems, Inc.,* 33 F.3d 390, 393–94 (4th Cir.1994) (*citing* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 at 10). This is because "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ..." *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553.

 "Once a defendant makes a properly supported motion for summary judgment, the burden shifts to the plaintiff to set forth specific facts showing that there is a genuine issue for trial." *Sylvia Development Corp. v. Calvert County, Md.,* 48 F.3d 810, 817 (4th Cir.1995) *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, and this burden is particularly important where the nonmoving party bears the burden of proof. *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir.1995) "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511. Put another way, there must be a *genuine* issue for trial.

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict ..." *Id.* Where, as here, a party moves for summary judgment based on lack of proof as to material facts, "the judge must ask himself ... whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

 As with any summary judgment motion, "the court must draw any permissible inference from the underlying facts established in the record in the light most favorable to the non-moving party." *Austin v. Clark Equipment Co.,* 48 F.3d 833, 835 (1995). But in order for an inference to be *permissible* it must be *reasonable,* and "[w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in 'light of the competing inferences' to the contrary." *Sylvia,* 48 F.3d at 818, *citing Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). As the Fourth Circuit has stated:

> [I]t is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.

*Sylvia,* 48 F.3d at 818 *citing Ford Motor Co. v. McDavid,* 259 F.2d 261, 266 (1958) (brackets in original). In short, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

[14–16] In a civil forfeiture action *in rem* brought pursuant to 21 U.S.C. § 881 or 18 U.S.C. § 981, the United States has the burden to "show probable cause that a substantial connection exists between the property forfeited and the criminal activity defined by the statute." *U.S. v. $95,945.18 United States Currency,* 913 F.2d 1106, 1110 (4th Cir.1990).[4] The probable cause determination "requires the court to make a practical common-sense decision whether, given all the circumstances set forth ... there is a fair probability that the properties to be forfeited" have a substantial connection to the specified criminal activity. *U.S. v. Thomas,* 913 F.2d 1111, 1114 (4th Cir.1990) (citing *Illinois v. Gates,* 462 U.S. 213, 238; 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)) (quotations omitted). Like the probable cause inquiry, the "substantial connection" requirement must be applied with common sense, *U.S. v. Santoro,* 866 F.2d 1538, 1542 (4th Cir.1989), and the Court is required to determine whether the property has more than an "incidental or fortuitous" connection with criminal activity. *U.S. v. Schifferli,* 895 F.2d 987, 990 (4th Cir.1990).

 Upon a finding of probable cause, the burden shifts to the claimant to show by a preponderance of the evidence that he or she owned the defendant property and the property was neither used nor intended to be used unlawfully. *Thomas,* 913 F.2d at 1114. A claimant can also avoid forfeiture of their interest by proving, by a preponderance of the evidence, that he or she neither consented to nor had knowledge of the illegal use and took reasonable steps necessary to prevent the property's illegal use. *See* 21 U.S.C. § 881(a)(7); 18 U.S.C. § 981(a)(2). Recognizing that the substantive law and standard of proof shapes the summary judgment inquiry, *see Anderson,* 477 U.S. at 247–48, 251–53, 106 S.Ct. at 2509–10, 2511–12, the Fourth Circuit has held that once the Government has made a showing of probable cause, the burden shifts to the claimant who cannot rest on mere allegations or denial but must come forward with specific facts showing that there is not a substantial connection between property at issue and the criminal activity outlined in the Government's complaint. *See $95,945.18,* 913 F.2d at 1111 (quotations and citations omitted); *see also, U.S. v. Premises Known as 717 So. Woodward Street,* 2 F.3d 529, 533 (3rd Cir.1993) ("It is thus true that a bare but sworn assertion of a claimant's lack of knowledge will not suffice to create a material dispute of fact where that assertion is impeached by a well supported showing to the contrary."); *U.S. v. 9844 South Titan Court,* 75 F.3d 1470, (10th Cir.1996) (same); *U.S. v. $83,320 in United States Currency & $40 in Canadian Currency,* 682 F.2d 573, 577–78 (6th Cir.1982) (same). Thus, while the Court is obliged to draw reasonable inferences in favor of the nonmoving party, those inferences must be reasonable in light of competing inferences to the contrary. *Sylvia,* 48 F.3d at 818, *citing Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). So if the claimant does not produce evidence sufficient to create a genuine issue of material fact, the unrebutted showing of probable cause is sufficient to support a forfeiture. *United States v. B & M Used Cars,* 860 F.2d 121, 125 (4th Cir.1988); *Thomas,* 913 F.2d at 1114.

As noted, 18 U.S.C. § 981(a)(1)(A) provides for the forfeiture of any real or personal property involved in a transaction in violation of 31 U.S.C. §§ 5313(a) or 5324(c) or any property traceable to such property. 18 U.S.C. § 981(a)(1)(A). In this case, the Government seeks the forfeiture of the property at Hillingdon Road and the Ford Taurus because they were involved in, facilitated, or represent the proceeds of the deposits structured to avoid the currency reporting requirement. Essentially, the Government argues that Curtis and Karen Leak committed multiple violations of 31 U.S.C. §§ 5313(a) & 5324 by causing three financial institutions to fail to complete the Currency Transaction Reports ("CTRs") as required by law and by structuring the case transactions with three separate financial institutions to avoid the reporting requirements. And the Fourth Circuit has held that a violation of Section

---

**4.** The Fourth Circuit employs the same analysis for forfeiture action brought under these statuto-ry sections. *See U.S. v. Santoro,* 866 F.2d 1538, 1542 (4th Cir.1989).

5324 is established by evidence that an individual knew of the reporting requirements and took steps to avoid them. *U.S. v. Wollman,* 945 F.2d 79, 81 (4th Cir.1991).

■ The Government and Ms. Leak have filed cross-motions for summary judgment. According to the Government, there is no genuine dispute concerning whether Ms. Leak was aware of, and participated in ef-. forts to evade, the currency transaction reporting requirements, and therefore, she has not satisfied her burden of establishing that she is an innocent owner within the meaning of § 981(a)(2). According to Ms. Leak, there is no evidence from which a reasonable juror could find that she had any knowledge of the reporting requirement, and therefore, she is entitled to summary judgment on her innocent owner defense as a matter of law.

The argument raises an interesting question about the nature of the innocent owner defense. By its terms, § 981(a)(2) which creates the "innocent owner" defense that Ms. Leak relies, provides that no property shall be forfeited "to the extent of the interest of an owner or lienholder by reason of any act or omission established by that owner or lienholder to have been committed without knowledge of that owner or lienholder." 18 U.S.C. § 981(a)(2). Read literally, the section merely requires the Government to show that the claimant knew about the act or omission that gave rise to liability—here the series of deposits less than $10,000—in order to forfeit the claimant's interest; and it does not require the Government to show that the claimant knew the acts are illegal, in order to rebut a properly supported claim under § 981(a)(2). This Court has found two courts that appear to read the statute this way. See *U.S. v. 105,800 Shares of Common Stock,* 830 F.Supp. 1101, 1131 (N.D.Ill.1993) (innocent owner within the meaning of § 981(a)(2) "refers to lack of knowledge of the illegal transaction, not lack of knowledge of the transaction's illegality."); *U.S. v. 316 Units of Mun. Securities,* 725 F.Supp. 172, 180 (S.D.N.Y.1989).

Indeed, *316 Units, supra,* is almost identical to the case at bar. In that case, a number of individuals had broken $318,000 into some 40 checks and then deposited those checks into the claimants' accounts so they could purchase the 316 units of municipal securities that the Government sought to forfeit. After concluding that the Government need only show that a person knew about, and acted to avoid, the reporting requirement in order to establish a violation of 31 U.S.C. § 5324(3), the court refused to grant summary judgment for the Government on the theory that the claimants knew of the currency transaction reporting requirements and acted to avoid them. *316 Units,* 725 F.Supp. at 177–79. But the court did grant summary judgment for the Government on the claimants' innocent ownership defense under § 981(a)(2). *Id.* at 180. In doing so, the court rejected the claimants' argument that they were entitled to an innocent ownership defense because they did not know that the structuring was illegal, holding that where the claimants actively engaged in the illegal structuring, they were not entitled to an innocent owner defense. *Id.* The court seems to have reasoned that allowing an innocent owner claim unless the Government could show that the claimants knew the structuring acts were illegal would have the effect of requiring the Government to show that the claimants willfully violated the structuring statute, although the purpose of § 5324(3) was to prohibit structuring even where there was no specific intent to violate the law. The court rejected the claimants' argument that § 981 was not aimed at their conduct since they were not engaged in any illegal activity, because their innocence did not prevent forfeiture. By holding that the Government was not entitled to a summary judgment of forfeiture on its structuring charge under 31 U.S.C. § 5324(3) because there was a genuine dispute concerning whether the claimants knew about and acted to evade the reporting requirement, *id.* at 179–80, but also holding that the government was entitled to summary judgment on the claimants' innocent owner defense under 18 U.S.C. § 981(a)(2), *id.* at 180, the court indicated that the Government did not need to show that the claimants were aware of the reporting requirement and took steps to avoid it in order to defeat the innocent owner defense, but rather, need only show that the claimants were aware of the illegal acts—

breaking down deposits into increments less than $10,000—in order to rebut any innocent owner claim.

This Court finds the reasoning in *316 Units* persuasive. But ultimately, this Court need not decide whether Ms. Leak must show that she was unaware of the deposits at issue, or unaware that the deposits were unlawful, or unaware that the deposits at issue were made for the purpose of avoiding the currency transaction reporting requirement, because she has failed to meet her burden of rebuttal under any standard. After all, Ms. Leak signed three checks from the very accounts into which the illegal deposits would be made within the next two days on the very day *before* the deposit spree occurred. She also annotated the checks to indicate the purpose for which the deposits were made, and her notations establish her knowledge that the checks were a part (a one third part) of a common scheme to pay off the mortgage on the Hillingdon Road property. Also, there is no doubt that her husband knew about the reporting requirement, that she made at least one and probably several of the deposits at issue, and that her car was used to make the deposits. She has also acted as the accountant for her husband's nightclub, which she now claims is the (legitimate) source of the funds that were deposited in the accounts owned or controlled by the Leaks.[5] Under these circumstances, Ms. Leak's claim that she was unaware of her husband's structuring scheme is untenable.

Ms. Leak's effort to explain away her participation in the structuring scheme is also untenable. According to Ms. Leak, the money she and her husband deposited between January 17 and 18, 1991 is legitimate income from her husband's nightclub (although she earlier filed tax returns which stated that the nightclub's income was only $96,693). Ms. Leak also argue that and what appears to be a transparent structuring scheme is really her husband's effort to ensure privacy and security by making small deposits in many banks for the purpose of avoiding theft. In short, Ms. Leak would have this Court believe that in order to avoid being robbed, she and her husband rode around Charlotte with some $152,000 in the car, even bringing large amounts of money to the same banks on the same days, in order to avoid theft so that no one would notice their large transactions (which is obviously not the case). Further, she implicitly asks this Court to believe that it is just a coincidence that all of the thirty-three transactions were below the $10,000 threshold for filing a CTR. Finally, Ms. Leak maintains that these deposits were consistent with her husband's effort to ensure the security and privacy of his bank deposits, but she has produced no evidence that he utilized this strategy at any time during the many years when he operated the nightclub. For these reasons, Ms Leak's bare assertion that there was another legitimate purpose for the two-day deposit spree is incredible as a matter of law, and so is her effort to make out an innocent ownership claim. Therefore, the Government's Motion for Summary Judgment will be granted.

**NOW, THEREFORE, IT IS ORDERED** that:

(1) the Government's Motion for Summary Judgment (document #120) be, and hereby is, *GRANTED;* and

(2) Karen T. Leak's Motion for Summary Judgment (document #124) be, and hereby is, *DENIED.*

(3) The Government is directed to submit a proposed final judgment in the next ten days.

---

**5.** The Leaks are currently being prosecuted for income tax evasion and related offenses.